JOHN C. WELLS, DC Bar 491292
Deputy Enforcement Director
JAMES T. SUGARMAN, WSBA 39107
Assistant Litigation Deputy
NINA H. SCHICHOR, MD Bar (no assigned number)
(E-mail: nina.schichor@cfpb.gov)
(Phone: 202-435-9770)
AMANDA C. ROBERSON, MN Bar 0398511
(E-mail: amanda.roberson@cfpb.gov)
(Phone: 202-435-9447)
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

Attorneys for Plaintiff
Consumer Financial Protection Bureau

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>Global Financial Support, Inc.,<br>d/b/a Student Financial Resource<br>Center, d/b/a College Financial<br>Advisory; and<br><br>Armond Aria a/k/a Armond Amir Aria,<br>individually, and as owner and CEO of<br>Global Financial Support, Inc.;<br><br>Defendants. | Case No. 15-cv-02440-GPC-AHG<br><br>**Memorandum in Support of the Bureau's Motion for Partial Summary Judgment on the Bureau's Claims Against Defendant Armond Aria**<br><br>Date: December 11, 2020<br>Time: 1:30pm<br>Crtrm: 2D<br>Judge: The Hon. Gonzalo P. Curiel |

1

# TABLE OF CONTENTS

2

**Page**

3

TABLE OF AUTHORITIES ...................................................................................iii

4

INTRODUCTION ...............................................................................................1

5

I.    Background.............................................................................................2

6

    A.   Procedural History...........................................................................2

7

    B.   Factual Background..........................................................................2

8

II.    Defendants' Solicitations Used Deceptive Language to Induce Consumers

9

    to Pay for Student Financial Advisory Services .....................................3

10

    A.   Defendants' Solicitation Packet Promised Consumers a "Program"
Through Which Consumers Could Apply for Financial Aid or Defendants

11

    Would Apply for Financial Aid on Their Behalf.................................4

12

    B.   Defendants' Solicitation Packet Promised to Conduct Extensive Searches
to Target or Match the Recipient with Particular Financial Aid

13

    Opportunities ...................................................................................7

14

    C.   Defendants' Solicitation Letter Told Consumers They Would Lose Their

15

    Opportunity to Receive Student Financial Aid Unless They Filled Out

16

    the Application and Paid Defendants by a Specified Deadline ...........9

17

    D.   Defendants' Solicitations were Likely to Induce Consumers to Pay Fees
to Enroll in Defendants' Program .....................................................9

18

III.   Defendants Did not Deliver on the Promises in the Solicitation Letter............10

19

    A.   Defendants Did not Provide a Financial Aid Program ......................10

20

    B.   Defendants Did not Conduct Searches to Target or Match Consumers

21

    with Particular Financial Aid Opportunities ....................................10

22

    C.   The Deadlines Identified in Defendants' Booklets Did Not Correspond to

23

    Any Real Deadline Associated With Any Financial Aid Opportunity.............12

24

IV.   Consumers have complained extensively about Defendants'

25

    misrepresentations..............................................................................12

LEGAL ARGUMENT ........................................................................................14

26

V.    The Bureau is Entitled to Summary Judgment on Counts I – III.........................14

27

    A.   Legal Standard for Summary Judgment............................................14

28

B.   The Bureau Is Entitled to Adverse Inferences Against Aria..............................15

C.   Defendants are Subject to the CFPA and Liable for Violations of It ...............16

D.   Defendants' Deceptive Practices Violated the CFPA......................................17

E.   Restitution, Injunctive Relief, and Penalties against Defendant Aria are Appropriate Here........................................................................................23

CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cal. Arch. Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,*
818 F.2d 1466 (9th Cir. 1987) .......................................................................14

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)..............................................................................14, 19

*CFPB v. Gordon,*
819 F.3d 1179 (9th Cir. 2016) ............................................................16, 17, 23

*CFPB v. Siringoringo,*
No. SACV 14-01155 JVS (AWx) (C.D. Cal. Oct. 26, 2016).......................23

*CFTC v. Co. Petro. Mktg. Group, Inc.,*
502 F. Supp. 806 (C.D. Cal. 1980) ................................................................24

*Doe ex rel. Rudy-Glanzer v. Glanzer,*
232 F.3d 1258 (9th Cir. 2000) .......................................................................15

*FTC v. AMG Capital Mgmt., LLC,*
910 F.3d 417 (9th Cir. 2018) ...............................................................17, 18, 21

*FTC v. Commerce Planet,*
815 F.3d 593 (9th Cir. 2016) ........................................................................23

*FTC v. Cyberspace,*
2002 WL 32060289 (W.D. Wash. July 10, 2002),
*aff'd* 453 F.3d 1196 (9th Cir. 2006)..............................................................21

*FTC v. Cyberspace.Com LLC,*
453 F.3d 1196 (9th Cir. 2006) ............................................................17, 20, 21

*FTC v. Figgie Intern., Inc.,*
994 F.2d 595 (9th Cir. 1993) ....................................................................22, 23

1   *FTC v. Five-Star Auto Club,*
2      97 F. Supp 2d. 502 (S.D.N.Y. 2000) ...................................................22
3   *FTC v. Pantron I, Corp.,*
4      33 F.3d 1088 (9th Cir. 1994) .............................................................20
5   *FTC v. Sec. Rare Coin & Bullion Corp.,*
6      931 F.2d 1312 (8th Cir. 1991) ...........................................................22
7   *FTC v. Stefanchik,*
8      2007 WL 1058579 (W.D. Wash. April 3, 2007),
9      *aff'd* 559 F.3d 924 (9th Cir. 2009).............................................21, 22
10  *FTC v. Stefanchik,*
11     559 F.3d 924 (9th Cir. 2009) .....................................................21, 23
12  *FTC v. Wells,*
13     385 F. App'x. 712 (9th Cir. 2010) ....................................................23
14  *Kraft, Inc. v. FTC,*
15     970 F.2d 311 (7th Cir. 1992) .............................................................21
16  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
17     475 U.S. 574 (1986)...........................................................................14
18  *Nationwide Life Ins. Co. v. Richards,*
19     541 F.3d 903 (9th Cir. 2008) .............................................................15
20  *SEC v. Colello,*
21     139 F.3d 674 (9th Cir. 1998) .............................................................15
22  *SEC v. Murphy,*
23     626 F.2d 633 (9th Cir. 1980) .............................................................24
24  *SEC v. Strategic Global Invs., Inc.,*
25     262 F. Supp. 3d 1007 (S.D. Cal. 2017).............................................15
26  *United States v. W.T. Grant Co.,*
27     345 U.S. 629 (May 25, 1953) ............................................................24
28

**Statutes**

12 U.S.C. § 5481(6)(A)...........................................................................................16

12 U.S.C. § 5481(15)(A)(viii)................................................................................16

12 U.S.C. § 5481(19) .............................................................................................16

12 U.S.C. § 5481(25)(B).........................................................................................17

12 U.S.C. § 5481(25)(C).........................................................................................17

12 U.S.C. § 5531 .....................................................................................................1

12 U.S.C. § 5536 .....................................................................................................1

12 U.S.C. § 5536(a)(1)(B) .....................................................................................16

12 U.S.C. § 5565(a)(1)...........................................................................................23

12 U.S.C. § 5565(a)(2)...........................................................................................23

12 U.S.C. § 5565(c)(2)...........................................................................................24

12 U.S.C. § 5565(c)(3)...........................................................................................24

Case No. 15-cv-02440-GPC-AHG
                      Mem. In Support of Partial Sum. Jud. Mot.

# INTRODUCTION

Defendants Armond Aria a/k/a Armond Amir Aria (Aria) and his company, Global Financial Support, Inc. (Global) conducted a nationwide operation that was likely to deceive students and their families into paying a fee in exchange for an illusory student financial aid program. Defendants lured consumers into paying the fee by falsely promising students a "program" through which they could "apply for the maximum merit and need-based financial aid," promising to match them with individually-targeted financial aid assistance programs, and indicating that students would lose out on financial aid if they failed to respond by a specified deadline. After making these promises, Defendants either mailed students a photocopied booklet of widely-available information gathered from public sources and not tailored to students' personal circumstances or, in many cases, sent them nothing at all. In this way, from January 2011 through October 2015, Defendants obtained over four million dollars from roughly 76,000 consumers yet failed to provide consumers with a single dollar of financial aid or any material help in obtaining it. Aria's deceptive acts and practices violate Section 1031 and 1036 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531 and 5536.

The Bureau requests that the Court enter summary judgment against Aria on its deception claims in counts I, II, and III because the undisputed facts show that his solicitation packets materially misrepresented the services they would provide to consumers.[1] The Bureau also seeks an order to remediate harmed consumers, to enjoin Aria from making future deceptive statements, and to impose civil penalties.

---

[1] The Bureau believes it can obtain full relief for consumers based on these claims alone and is not seeking summary judgment on counts IV and V.

## I.   Background

### A. Procedural History

The Bureau commenced this action on October 29, 2015.[2] It was stayed on May 17, 2016 due to a pending criminal investigation of Aria.[3] On May 27, 2019, the Court lifted the stay, noting that three years had not resulted in an indictment and "the possibility that the civil proceedings will hamper the Defendants' ability to defend in an inchoate criminal proceeding [is] speculative and unripe."[4] On July 12, 2019, the Court granted then-defense counsel's motion to withdraw as counsel for all Defendants and ordered Global to secure substitute counsel within 30 days.[5] Global did not secure counsel, and on January 30, 2020, the Clerk of Court entered default against Global for failure to defend itself in this action.[6] During discovery, including at his deposition, Aria invoked his Fifth Amendment privilege against self-incrimination in response to many of the substantive questions relating his and Global's business practices.[7]

### B. Factual Background

Defendant Global is a California corporation.[8] Defendants' documents describe Global as a company that provides "financial aid assistance" and "financial aid services."[9] Global used the d/b/a College Financial Advisory ("CFA") between 2005 and 2011, then retired the CFA name and continued operations under a new d/b/a, Student Financial Resource Center ("SFRC"), from 2012-2016.[10] Global ceased sending

---

[2] Compl., ECF No. 1.
[3] Order Granting Stay, ECF No. 34.
[4] Order Lifting Stay, ECF No. 73 at 3:24-26.
[5] Order Granting Mot. to Withdraw, ECF No. 79.
[6] Default, ECF No. 90 (entering default against Global). The Bureau is separately moving for a default judgment against Global for the same conduct addressed in this motion and on Counts IV and V and is seeking the same relief against both Defendants.
[7] Bureau's Statement of Undisputed Facts (UF) at ¶ 48.
[8] UF ¶¶ 1, 12.
[9] UF ¶ 2.
[10] UF ¶ 1.

solitications in 2016.[11]

Defendant Aria is the owner, CEO, and registered agent of Global; he was also represented in Global's corporate filings as the President and CEO of Global's two fictious identities: CFA and SFRC.[12] Before forming Global, Aria had no substantive work experience in or knowledge of the financial aid industry.[13] Aria ran and oversaw every aspect of his company's financial and business operations; in his words, Aria was "in charge of the entire company."[14] Aria appears to have spent much of the proceeds from Global's business on personal expenses unrelated to the business.[15] Because Global acted almost entirely through Aria and all of the conduct addressed herein was undertaken by both Defendants, their conduct is addressed jointly herein for clarity.

## II.   Defendants' Solicitations Used Deceptive Language to Induce Consumers to Pay for Student Financial Advisory Services

Defendants' solicitation packets contained the following: a letter offering a financial aid "program" in exchange for a $59-$78 fee (the fee varied depending on the year); a "Student Aid Profile Form" that required the recipient to provide detailed information about the prospective student and their family; and a return envelope.[16] Between January 2011 and October 2015, Aria mailed these packets to millions of graduating high school seniors, enrolled college students, and their families.[17] Aria identified prospective customers by purchasing lists of student information from third-party marketing firms.[18] Packets mailed in 2011 indicated they were from CFA; those mailed in 2012 and later indicated they were from SFRC.[19] In these solicitations,

---

[11] UF ¶¶ 1, 9.
[12] UF ¶ 3.
[13] UF ¶ 5.
[14] UF ¶¶ 6, 7.
[15] UF ¶ 67.
[16] UF ¶ 13, 15, 18.
[17] UF ¶ 13, 14.
[18] UF ¶ 16.
[19] UF ¶¶ 1, 25.

Defendants misrepresented (1) that they provided "a program" through which consumers could apply for financial aid or through which Defendants would apply for financial aid on consumers' behalf; (2) that they conducted extensive searches to target or match individual consumers with particular financial aid opportunities; and (3) that consumers would lose their opportunity to receive aid unless they fill out Defendants' application and paid by the specified deadline.

### A. Defendants' Solicitation Packet Promised Consumers a "Program" Through Which Consumers Could Apply for Financial Aid or Defendants Would Apply for Financial Aid on Their Behalf

Defendants' solicitation letter repeatedly referred to their product as a "program."[20] In addition to a prominent description of the product as a program in the text of the letter, Defendants' solicitation packets referenced their supposed "program" in the letter's signature block; in a footnote appended to a table prominently listing the college attended by the student and a purported student profile number; in the title of the section of the Student Aid Profile form instructing the consumer to certify her answers; in the return address on Defendants' envelope; and on the back of the envelope Defendants used to mail the packets.[21]

Defendants' solicitation materials indicated to consumers that responding would enroll them in the "program" and suggested that by doing so they would be applying for or taking a step in the process of applying for, financial aid.[22] The 2014-2015 version of the letter, for example, stated that students should return the form "to proceed with the 2014-2015 Student Financial Resource Center (SFRC) program and apply for the

---

[20] UF ¶¶ 19; **SJX 23** ¶¶ 4-12.

[21] UF ¶¶ 19 25; **SJX 23** ¶¶ 4-12.

[22] UF ¶¶ 18, 19; **SJX 23** ¶¶ 4-12. Defendants also referred to their product as a "financial aid package." UF ¶¶ 18, 37; **SJX 8** Barrieau Decl. at 825 (penultimate sentence of Section VI), 832 ("2014-2015 Financial Aid Package"). Some consumers expected that returning the enclosed form would lead Defendants to send actual financial aid. UF ¶ 34.

maximum merit and need-based financial aid programs."[23] Defendants' letter also prominently discussed other, actual financial aid programs.[24] The letter Defendants used, for example, referenced three federal financial aid programs in bold, italicized type: Pell Grants, the Federal Supplemental Educational Opportunity Grant (FSEOG), and Work Study.[25] But Defendants' letter did not explain that its "program" had nothing to do with, and was entirely unlike, these programs, which provide money directly to students.[26] Consumers reading the letter were likely to—and did—believe that Defendants' program was similar to these financial aid programs.[27]

Defendants referred throughout their solicitation materials to consumers' opportunity to "apply" for financial aid,[28] indicating that by responding consumers would be applying, or least taking a step in the process of applying. The materials instructed students to "apply early"—that is, respond early to the solicitation.[29] Defendants even used "apply" in their phone number: "1-888-730-APPLY."[30] Defendants' solicitation materials also referred to "processing" students' responses, including through a supposed "Processing Division."[31] Defendants' materials described the steps taken to "process" applications and some indicated that the "process" took four to six weeks.[32] These references reinforced the impression that by responding to the offer consumers would be applying for financial aid available through Defendants' program. For example, one consumer interpreted this language to mean that "the payment was for some sort of

---

[23] UF ¶ 18; **SJX 25** at 19; **SJX 23** ¶ 10.
[24] UF ¶ 19; **SJX 23** ¶ 9.
[25] UF ¶ 19; **SJX 23** ¶ 9; **SJX 25** at 001, 007, 013, 019, 025; *see also* UF ¶ 32-33.
[26] UF ¶ 19; **SJX 25**; **SJX 23** ¶¶ 7-11.
[27] UF ¶¶ 31, 34; *see* UF ¶ 25.
[28] UF ¶ 18; **SJX 25**; **SJX 23** ¶¶ 8, 10.
[29] UF ¶ 18; **SJX 25** at 15.
[30] UF ¶¶ 18; **SJX 25** at 7, 13, 19, 25; *see also* **SJX 25** at 1 ("1-888-4-APLY-NOW").
[31] UF ¶¶ 18, 27; **SJX 25**; **SJX 23** ¶ 13.
[32] UF ¶¶ 18, 27; **SJX 25**; **SJX 23** ¶ 13, 14.

financial aid application processing."[33] Another consumer noted that the name Student Financial Resource Center—"sounded like an official office for processing aid applications."[34]

Bolstering the impression that Defendants' "program" applied for financial aid on the consumer's behalf, Defendants' letters also incorporated the name of the student's college or university, when that information was available, and listed a nine digit "student profile number" as displayed below.[35]



When students' letters contained their schools' names, it created the impression that the letters originated from or were associated with the students' schools' financial aid offices.[36] The profile number also gave "the impression that this application was an official, credible, and legitimate student financial aid application."[37] Defendants also used the return address "777 Campus Commons Rd." on the front and back of the solicitation envelopes, which despite incorporating the word "campus" is actually a virtual office that forwarded mail to a mailbox near Aria's house.[38]

Defendants also used a seal throughout the solicitation package, including as a watermark on the solicitation letter.[39] As shown below, the seal shares features with seals used by the Department of Education and commonly used by colleges and universities. Like the SFRC seal, the seal from the Department of Education contains two concentric

---

[33] UF ¶ 34; **SJX 14**, Lilly Decl. ¶ 4.

[34] UF ¶ 34; **SJX 18**, Senat Decl. ¶ 3.

[35] UF ¶ 20 (letters include name of student's college or university); *see also* UF ¶ 16, 17 (student information provided by third-party marketing firms); UF ¶ 20; **SJX 14** Lilly Decl. at 034 (displaying the image). The student's profile number and college attended were also included in the footer of the solicitation letter. *Id.*

[36] UF ¶¶ 20, 31.

[37] **SJX 11**, Coffer Decl. ¶ 3.

[38] UF ¶ 26; **SJX 23** ¶ 22.

[39] UF ¶ 21; **SJX 25** at 009, 011-012 (template showing seal); **SJX 23** ¶ 20-21.

Case No. 15-cv-02440-GPC-AHG
                                    Mem. In Support of Partial Sum. Jud. Mot.

circles that feature the organization's name stretched inside the exterior circle and a picture in the center of the inner circle incorporating leaves. The SFRC seal also contained an eagle, an image commonly used in the seals of federal government agencies.

   
[40]

The seals of schools attended by the consumers who received Defendants' solicitation letters, such as, for example, North Carolina State University and the Santa Fe College, often used similar formatting and featured images associated with knowledge and higher learning. Defendants' seal increased the likelihood that consumers would think the solicitation was affiliated with the student's school or a government agency—in the words of one consumer: the seal "was particularly official-looking and seemed like it was from the Department of Education or [the student]'s University."[41] Defendants admit they were not actually associated with any school or government agency.[42]

**B. Defendants' Solicitation Packet Promised to Conduct Extensive Searches to Target or Match the Recipient with Particular Financial Aid Opportunities**

Defendants promised to "match" or "target" students with specific scholarships or financial aid available to them based on their individual characteristics. For example, Defendants' solicitation letters sent between 2015 and 2016 promised to "conduct[] extensive searches to *match* student's qualifications and background" to financial aid programs.[43] And the letters sent between 2011 and 2015 stated that Defendants would "strive to provide as many *targeted* financial aid opportunities as possible to each and

---

[40] UF ¶ 21.
[41] **SJX 7**, Amendola Decl. ¶ 3; *see also* UF ¶ 31.
[42] UF ¶ 44.
[43] UF ¶ 18; **SJX 25** at 026 (top box, second sentence).

every student, regardless of his/her financial status or academic performance."[44] Defendants' website, which was flagged for consumers on every page of the solicitation letter and both sides of the envelope, promised Defendant would conduct: "precise extensive research to match each student's qualification and background to available free merit and need-based financial aid programs."[45] These representations were likely to— and did—make consumers think that Defendants "would match [the student]'s qualifications to particular student financial aid opportunities that were appropriate for [the student]" and that Defendants "would conduct an individualized search of financial aid opportunities for [the student]."[46]

The solicitation packet also included a two-page "Student Aid Profile Form" that asked for a large amount of personal information of the kind that might be needed to target specific scholarships.[47] The form requested the applicant's date of birth, marital status, grade point average, educational goals, racial and ethnic background, work history, and involvement in clubs, religious organizations and sporting activities, and also the applicant's parents' occupation and employer, highest level of school completed, and military status and affiliation, if any.[48] At the end of the form, the "preparer" was required to certify with their dated signature that "all of the information on this form is true and complete to the best of my knowledge."[49] In the words of one consumer who completed the form seeking financial aid for their daughter, the detailed information requests "bolstered my impression that SFRC would provide individualized assistance to my daughter."[50] But Defendants did not provide responses that were specifically targeted

---

[44] UF ¶ 18; **SJX 25** at 004, 010, 016, 022, 028 (certification section, penultimate sentence); *see also* UF ¶ 29.

[45] UF ¶ 24; *see also* **SJX 22** ¶ 4.

[46] **SJX 10**, Chandler Decl. ¶ 5; **SJX 9**, Biesiada Decl. at ¶ 5; *see also* UF ¶ 35.

[47] UF ¶ 22.

[48] *Id.*

[49] UF ¶¶ 22, 23.

[50] **SJX 7**, Amendola Decl. ¶ 5; *see also* UF ¶ 35.

to the consumer; instead, where they responded at all they provided only a photocopied booklet of publicly available contact information for scholarships.[51]

### C. Defendants' Solicitation Letter Told Consumers They Would Lose Their Opportunity to Receive Student Financial Aid Unless They Filled Out the Application and Paid Defendants by a Specified Deadline

Defendants' solicitation contained a "filing deadline" and due date in the top right-hand corner of the solicitation letter similar to the image below.[52]



The letter's fourth paragraph re-stated the deadline in bolded and underlined text and the subsequent paragraph stated that "not all financial aid funds will be available" after the deadline.[53] The "filing deadline" was reiterated at the top of the instruction page.[54] Consumers were likely to, and some did "believe[] that [they] could lose out on getting additional merit or need-based financial aid if [they] did not respond by the filing deadline."[55] But Defendants have admitted that the "filing deadline" did not represent any actual deadline for federal financial aid, nor was it based on any other financial-aid application.[56]

### D. Defendants' Solicitations were Likely to Induce Consumers to Pay Fees to Enroll in Defendants' Program

Between 2011 and October 2015, at least 76,000 consumers who received Defendants' solicitations paid a total of $4,783,064 in fees to Defendants to apply for

---

[51] *See infra* Sections III.A and III.B.
[52] UF ¶¶ 18, 28; **SJX 23** ¶ 15.
[53] *Id.*
[54] *Id.*
[55] **SJX 17** Sanjurjo Decl. ¶ 5; *see also* UF ¶ 36.
[56] UF ¶ 29.

enrollment in Defendants' "program."[57]

### III.   Defendants Did not Deliver on the Promises in the Solicitation Letter

#### A. Defendants Did not Provide a Financial Aid Program

By their own admission, Defendants did not provide consumers with financial aid or apply for financial aid on behalf of consumers.[58] As described, some consumers who enrolled in Defendants' program received a booklet that contained general, publicly-available advice about applying for financial aid and some contact information about widely-available scholarships copied from websites, books, and other publications;[59] other consumers received nothing at all.[60]

#### B. Defendants Did not Conduct Searches to Target or Match Consumers with Particular Financial Aid Opportunities

The undisputed facts show that Defendants did not "match" consumers with individualized opportunities, nor did they "target" any student financial aid on behalf of consumers.[61] Dozens of consumers reported receiving nothing at all.[62] Consumers who received Defendants' booklets were surprised to find that they were mostly copies of information from other sources: Consumers described the booklets as "black and white photocopies bound by staples" and noted that they "could have easily been made with a copy machine and stapler."[63] Moreover, with a single exception, the booklets did not include the scholarships' specific application deadlines.[64]

In written discovery responses and in his deposition, Aria stated that the booklets

---

[57] UF ¶ 65; *see* UF ¶¶ 15, 64. Defendants sent the solicitations at issue in this case to more than 3.9 million consumers. UF ¶ 14.
[58] UF ¶¶ 40, 42, 43; *see generally* UF ¶ 37, 42.
[59] UF ¶¶ 39, 42, 45-48; **SJX 23** ¶ 35-43.
[60] UF ¶ 38.
[61] UF ¶¶ 39, 41.
[62] UF ¶ 38.
[63] **SJX 19** Smith Decl. ¶ 10; **SJX 8** Barrieau Decl. ¶ 12; *see generally* UF ¶ 46.
[64] UF ¶ 41; **SJX 23** ¶ 37.

were created at "a group level"[65] rather than individually tailoring the booklet to information provided by students. Booklets sent between 2011 and 2014 contained very little variation.[66] They began with 20 pages of introductory material and scholarship advice, such as providing a "Basic Financial Aid Overview" and advice about "How to Ask for Recommendation Letter," then included 25 to 35 pages of information about scholarships that were purportedly available to all students, followed by a 6-page section listing scholarship information for various minority groups (included without regard to whether the student had indicated that he or she was a member of any minority group).[67] Booklets sent in the 2014-2015 and 2015-2016 cycles in some instances also contained additional information relating to athletic scholarships, scholarships for students with an interest in life sciences or pre-professional careers, or scholarships for military-affiliated students.[68] These categories of information were not provided to all consumers who identified applicable characteristics on their form, however.[69]

      Aria represented in discovery that he did not keep records of the booklets sent to consumers and he could not produce any examples of the actual booklets that were

---

[65] UF ¶ 45.

[66] **SJX 23** ¶¶ 35-43 (summarizing booklet contents); UF ¶¶ 39, 52.

[67] UF ¶¶ 39, 52; **SJX 23** ¶ 38. The scholarship information included the name, contact information, and a brief description of each scholarships. UF ¶ 49; *see* **SJX 7** Amendola Decl. at 748; **SJX 8** Barrieau Decl. at 832; **SJX 10** Chandler Decl. at 927; **SJX 17** Sanjurjo Decl. at 049; **SJX 19** Smith Decl. at 153 (booklets).

[68] UF ¶¶ 39, 53, **SJX 7** Amendola Decl. at 748; **SJX 17** Sanjurjo Decl. at 049.

[69] For example, a white male consumer from Vermont designated in the form he filled out for the 2014-2015 academic cycle his gender, race, home state, that his parents served in the military, and possible majors of graphic design and computer science. UF ¶ 47, **SJX 23** ¶ 41. But the booklet he received did not list relevant military or career scholarships. It did, however, contain an entire section of scholarships for non-white applicants. And while it contained nine pages of state-based contact information, none of this information was for the consumer's home-state of Vermont. *Id*. A Kentucky consumer received an identical booklet, except for the name listed on the booklet. *Id*., **SJX 23** ¶ 40.

mailed to consumers.[70] During discovery, the Bureau sought to confirm what was included in the booklets Defendants purportedly sent to consumers enrolled in their program, and how, if at all, these booklets were tailored to students based on their responses to Defendants' solicitations.[71] Aria refused to answer these questions on Fifth Amendment grounds.[72] Accordingly, in Section V.B below, the Bureau seeks an adverse inference regarding the information included in Aria's booklets.

### C. The Deadlines Identified in Defendants' Booklets Did Not Correspond to Any Real Deadline Associated With Any Financial Aid Opportunity

Aria conceded that the "filing deadline" in Defendants' solicitation letters did not represent any actual deadlines for federal financial aid.[73]

### IV.   Consumers have complained extensively about Defendants' misrepresentations

Hundreds of consumers complained about Defendants' misrepresentations to state and federal government agencies.[74] In response to complaints from an Iowa consumer, the Iowa Attorney General's Office took action based on Defendants' solicitation package discussed above.[75] It imposed a state-wide ban on advertising or marketing of any nature by Defendants and required Defendants to pay a $25,000 fine.[76] From January 2011 to September 2015, consumers made 230 complaints about Defendants that were collected in the Federal Trade Commission (FTC)'s consumer complaint database (Sentinel).[77] Consumers complained that they believed Defendants would apply for financial aid on their behalf, help them apply for financial aid, or provide tailored

---

[70] UF ¶ 50.
[71] UF ¶ 48; **SJX** 6.
[72] *Id.*
[73] UF ¶¶ 29, *see generally* UF ¶ 30.
[74] UF ¶¶ 54-55.
[75] UF ¶ 55.
[76] UF ¶ 55; **SJX 59**, Iowa Order.
[77] UF ¶ 54; *see also* UF 56.

opportunities matched to their specific qualifications and background—and were angry when they received nothing at all or only a thin booklet in return.[78] Consumers also wrote that they believed they needed to file by the deadline contained in the letter or risk losing financial aid opportunities.[79] They also stated that Defendants' solicitations looked like they originated from an entity affiliated with a government agency or the student's college, which bolstered their belief that enrollment in the "program" would lead to financial aid.[80]

From January 2008 to October 2015, over 175 consumers also filed complaints about Defendants' solicitations with the Better Business Bureau (BBB).[81] The BBB withdrew CFA's accreditation in November 2011 "due to the number of complaints received by the BBB."[82] Shortly thereafter, Defendants stopped using the CFA name and began operating as SFRC.[83] In 2013, the BBB accused Defendants of "deceptive advertising" and "unethical practices" and requested that Defendant "cease the practice of charging consumers for financial aid assistance and sending them only information that is freely available."[84] Currently the BBB has a warning on their website that Defendant "is in current violation of the BBB name and logo policy and has falsely stated BBB membership or referenced the BBB name in an unauthorized manner."[85] Consumer complaints to the BBB were similar to (and sometimes repetitive of) those in Sentinel.[86] There may have been more complaints as well: Aria provided no complaint information

---

[78] UF ¶¶ 54, 57; **SJX 22** ¶ 4; *see also* UF ¶¶ 34, 35.
[79] UF ¶¶ 54, 57; **SJX 22** ¶ 4; *see also* UF ¶ 36.
[80] UF ¶¶ 54, 57; *see also* UF ¶ 31.
[81] UF ¶ 60.
[82] UF ¶ 61; **SJX 52**.
[83] UF ¶¶ 1, 4.
[84] UF ¶¶ 61-62.
[85] UF ¶ 63.
[86] UF ¶ 60; **SJX 23** ¶ 26 (summarizing BBB complaints).

to the Bureau in response to discovery requests, asserting that he did not keep it.[87] And Defendants sometimes required consumers who sought a refund to remove the complaints they filed with the BBB before refunding consumers.[88]

Consumers also complained to colleges and universities, many of which posted public warnings calling what Defendants offered a "scam."[89] For example, the University of Minnesota Financial Aid Office's website post titled its warning: "Current SCAM Letter Being Sent to Students and Families."[90] The post included the solicitation letter at issue here and reminded students that "Any group requesting money to be considered for financial aid is scamming you."[91] North Carolina State University posted an article titled: "Don't Get Scammed!" with a similar warning, referring to Defendants' solicitation letter.[92] At least 21 schools warned students about Defendants' services on their websites or through news articles.[93]

## LEGAL ARGUMENT

## V.   The Bureau is Entitled to Summary Judgment on Counts I – III

### A. Legal Standard for Summary Judgment

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[94] Once the Bureau has made a prima facie case for summary judgment, Defendants cannot rely on general denials but must designate "specific facts" showing that there is a genuine issue

---

[87] UF ¶ 66.
[88] *Id.*
[89] UF ¶ 58; **SJX 29-51** (college advisories); **SJX 23** ¶ 28.
[90] UF ¶ 59; **SJX 39**, Morris Advisory; **SJX** 23 ¶ 28.
[91] *Id.*
[92] *Id.*; **SJX 40**, NC State Advisory; **SJX 23** ¶ 28.
[93] UF ¶ 58; **SJX 29-51** (college advisories); **SJX 23** ¶ 28.
[94] Fed. R. Civ. P. 56(c); *see* UF ¶¶ 10, 11 (admitting jurisdiction and venue).

for trial.[95] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[96]

## B. The Bureau Is Entitled to Adverse Inferences Against Aria

As this Court has previously noted, courts may draw adverse inferences against parties asserting their Fifth Amendment privilege against self-incrimination.[97] Courts in this Circuit have done so where (1) there is a substantial need for the information; (2) there is not another less burdensome way of obtaining that information, and (3) there is independent evidence of the fact about which the party refuses to testify.[98] When these factors are present and the court draws an adverse inference against a defendant, the burden shifts to the defendant to prove otherwise.[99]

The Bureau sought additional information about the content and customization of the booklets Defendants provided to consumers in discovery from Defendants. As noted above, despite the Bureau's repeated attempts to discover this information, Defendants refused to provide any booklets or the information contained within the booklets that were actually sent to consumers.[100] The Bureau also asked Aria in his deposition about

---

[95] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[96] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citations omitted). If the non-moving party's claim is implausible in light of the facts presented, that party bears a greater burden of producing even more compelling evidence than would otherwise be required to defeat a summary judgment motion. *Cal. Arch. Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir. 1987).

[97] Order Granting Stay, ECF No. 34 at 6; *see also Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911 (9th Cir. 2008); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000); *SEC v. Colello*, 139 F.3d 674, 677-78 (9th Cir. 1998); *SEC v. Strategic Global Invs., Inc.*, 262 F. Supp. 3d 1007, 1023 (S.D. Cal. 2017) (citing *Colello*).

[98] *Nationwide Life Ins. Co.*, 541 F.3d at 912 (quoting *Glanzer*, 232 F.3d at 1265).

[99] *Colello*, 139 F.3d at 678 (affirming district court's application of an adverse inference against defendants at summary judgment based on invocation of Fifth Amendment privilege and separate independent evidence, shifting burden to defendant to show that he had a legitimate claim to funds in his possession).

[100] *See* UF ¶ 51.

the customization and content of the booklets provided to consumers, and he refused to answer, asserting his Fifth Amendment privilege against self-incrimination.[101] The Bureau has obtained independent evidence of the content and customization of the booklets from consumers, as described above in Section II.B & III.B. Accordingly, the Bureau asks the Court to make two related adverse inferences: (1) that between 2011 and 2014 Aria sent consumers booklets with the information listed in the categories in UF ¶ 52; and (2) after 2014, Aria likewise sent booklets with only information in the categories listed in UF ¶ 53 to consumers.[102]

## C. Defendants are Subject to the CFPA and Liable for Violations of It

Under Section 5536(a)(1)(B) of the CFPA, it is unlawful for any covered person to engage in any deceptive practice.[103] A "covered person" is "any person that engages in offering . . . a consumer financial product or service," which includes "financial advisory services."[104] Financial advisory services include "advising" on "individual financial matters or relating to proprietary financial products or services."[105]

Defendants' solicitation offered to advise on the "individual financial matters" of student financial aid assistance and "relating to proprietary financial products or services," namely Defendant's proprietary "program," which offers student financial aid assistance.[106] As discussed in Section II.B, the "Student Aid Profile Form" in Defendants' solicitation packet asked for detailed information about the student and parents. The solicitation offered to use that information to target and match students with individualized scholarship opportunities in exchange for a fee. Even Defendants' name choices "College Financial Advisory" and "Student Financial Resource Center"

---

[101] UF ¶ 48; *see generally* UF ¶ 50.
[102] UF ¶¶ 52, 53.
[103] 12 U.S.C. § 5536 (a)(1)(B); *CFPB v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016).
[104] 12 U.S.C. §§ 5481(6)(A), (15)(A)(viii), (19).
[105] 12 U.S.C. § 5481(15)(A)(viii).
[106] *E.g.*, UF ¶ 2; UF ¶ 25; **SJX 23 ¶¶** 4-12; *see* Section II.A.

suggested to consumers that Defendants were entities that offered advice on financial aid. Consumers believed that Defendants "would be like a financial aid counselor at a school," and that they were "applying and paying for a specific financial aid program that included targeted searches for financial aid opportunities."[107] Global and Aria are therefore covered persons under the CFPA.

Aria is also subject to the CFPA because he is a "related person" to Global. A "related person" is any director, officer, or employee charged with managerial responsibility for, or a controlling shareholder of, or an agent for, a covered person.[108] Here, Aria is a related person because he held every leadership role in Global and made or oversaw all business decisions for the entity.[109] As the sole owner of Global, Aria has also personally profited from the business practices that are at issue in this case.[110] Because he is a "related person" he is, by operation of law, a "covered person" and is liable for Global's violations of the CFPA.[111]

**D. Defendants' Deceptive Practices Violated the CFPA**

An act or practice is "deceptive" under the CFPA if (1) there is a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material.[112] A representation is deceptive if the overall "net impression" it creates—taken as a whole—is likely to mislead consumers.[113] Proof of actual deception is not required, the standard is

---

[107] UF ¶¶ 34-35; **SJX 13**, Lee Decl. ¶ 8; **SJX 17**, Sanjurjo Decl. ¶ 6.
[108] 12 U.S.C. § 5481(25)(C).
[109] UF ¶¶ 3-4, 6-9.
[110] UF ¶ 67.
[111] 12 U.S.C. § 5481(25)(B); *see CFPB v. Gordon*, 819 F.3d 1179, 1196 (9th Cir. 2016) (affirming decision to hold individual and company jointly and severally liable where, like here, individual had control over and approved deceptive marketing materials).
[112] *Gordon*, 819 F.3d at 1192-93.
[113] *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).

instead whether conduct is likely to mislead.[114] Here, Defendants misrepresented (1) that they provided "a program" through which consumers could apply for financial aid or through which Defendants would apply for financial aid on consumers' behalf; (2) that they conducted extensive searches to target or match individual consumers with particular financial aid opportunities; and (3) that consumers would lose their opportunity to receive aid unless they applied by the specified deadline.

The language and format of Defendants' solicitation packets are not in dispute. As discussed in Section II.A above, Defendants represented to consumers that they would provide a "program" through which consumers could apply for financial aid or through which Defendants would apply for financial aid on their behalf.[115] Other indicia in Defendants' solicitation packets bolstered the impression that Defendants offered such a program. Defendants used business names to solicit consumers that suggested affiliation with a government program or university financial aid office,[116] and their solicitations used formatting, language, and a seal similar to that used by institutions that traditionally provide financial aid, such as the Department of Education.[117] Defendants' solicitations also used terms such as "Processing Center," "processing fees," "filing deadline," and "apply," which could be interpreted to suggest that Defendants were "processing" financial aid applications or financial aid information to provide to consumers.[118] There is also undisputed evidence that Defendants' use of the names of students' colleges or universities when that information was known, along with a return address of "campus commons" and an official-looking seal, caused numerous students to think the letters

---

[114] *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 422 (9th Cir. 2018) (proof of actual deception not required).

[115] UF ¶¶ 15, 18-19; **SJX 23** ¶ 4-12;

[116] UF ¶¶ 1, 18; **SJX 25**; *see* UF ¶ 31.

[117] UF ¶¶ 18-19, 21, 25, 27-28; ¶ **SJX 25**; *see* UF ¶ 31.

[118] UF ¶¶ 27-28; **SJX 23** ¶¶ 13-15; *see* UF ¶ 34. Defendants also called the product ultimately provided to consumers a "financial aid package," further bolstering this impression. UF ¶¶ 18, 37.

were sent by their colleges or universities.[119] But by Defendants' admission, they did not provide any financial aid to consumers, apply for financial aid on any consumer's behalf, or offer any "program" beyond the booklet they mailed to consumers.[120]

As discussed above in Section II.B, the language in Defendants' letters representing that they conducted extensive searches to target or match consumers with particular financial aid opportunities also is not in dispute.[121] The content and title of the "Student Aid Profile Form,"—which solicited personal information and a certification of the veracity of that information—is also not in dispute.[122] The solicitation of this information suggested that it would inform the service described in the letter— specifically, that Defendants' program would use the information collected to match consumers with scholarships available to them based on their responses.[123] But, as discussed above in Sections III.B and IV, Defendants never provided any individualized advice, and the booklets Defendants provided did not contain financial aid opportunities tailored to particular students.[124] And Defendants failed to provide many consumers who enrolled in their program with anything at all.[125]

In discovery, Aria did not deny that Global "did not conduct research to match individual consumers" with scholarships. Instead, Aria stated in written discovery and in his deposition that "the Booklets were designed and created at a group not individual level."[126] When the Bureau asked Aria to define "group level," he invoked his Fifth

---

[119] UF ¶¶ 16, 17, 20, 21, 26, 31-33, 58-59. Actual deception is not required to establish deceptive conduct. *AMG Capital Mgmt.*, 910 F.3d at 422.
[120] UF ¶¶ 37, 40, 42, 43.
[121] UF ¶ 18; **SJX 25**.
[122] *Id.*
[123] *See* UF ¶ 35.
[124] *See supra* Sections III.B and IV.
[125] *See supra* Sections III.A and III.B.
[126] **SJX 2** at 13:26-28; **SJX 6**, Dep. at 51:22-25; UF ¶ 45.

Amendment privilege.[127] That the booklets Defendants provided were not individualized or targeted to specific students is thus not actively disputed by the Defendants. Aria's vague statement that the booklets were differentiated by "group," while refusing to explain what that means or provide evidence of this characterization, appears to be an unsubstantiated general denial.[128] If the Court grants the Bureau's request for an adverse inference, then the content of booklets provided to consumers between 2011 and 2014, and later, between 2014 and 2016, are indisputable. And even if Aria's vague statement is credited, booklets created at a "group level" are not the individualized financial aid opportunities as represented in the solicitation letter. And Defendants' booklets indisputably did not provide consumers with essential information about scholarships, including whether the scholarships were still open for application and when applications were due.[129]

Finally, as discussed in Section II.C, Defendants' letters represented that consumers would miss out on opportunities to receive aid unless they filled out Defendants' application and paid by a specified deadline.[130] Defendants' inclusion of a "filing deadline," often bolded and underlined in the solicitation letter, is not in dispute. That Defendants' letters informed consumers that they "must" meet the deadline unless "special circumstances" applied and threatened that late applications would suffer because "not all financial aid funds will be available" is also undisputed. But, as discussed in Section III.C, Defendants admit that the "deadline" in the letter was "not any actual deadline for federal student aid" and instead was invented by Defendants.[131]

A misrepresentation is material if it "involves information that is important to

---

[127] UF ¶ 48.
[128] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (nonmoving party must designate specific facts showing a genuine issue).
[129] UF ¶ 41.
[130] *See supra* Section II.C.
[131] UF ¶ 29; *see also* UF ¶ 30.

consumers and, hence, is likely to affect their choice of, or conduct regarding, a product."[132] It is well-established that express claims contained in solicitations are presumed material.[133] Similarly, implied claims that are designed to induce a decision are presumed to be material,[134] and can be deceptive even where the statement is literally true.[135] Defendants' representations in the solicitation packets describing the "program" offered, indicating that it would be individually tailored, and stating a deadline are material because each describes a core aspect of the "financial aid program" to be provided in exchange for the fee.

And while actual deception need not be proven to establish materiality,[136] it is instructive. As discussed in Sections III and IV, the attached consumer declarations, consumer complaints to the FTC and BBB, numerous college and university advisories, and the actions of the BBB, and the Iowa Attorney General demonstrate that hundreds of people and many organizations found the same solicitations misleading.[137] They also show that the representations in the solicitation letters were material. Consumers repeatedly complained that they applied to Defendants' "program" based on the letter's

_____

[132] *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).

[133] *See FTC v. Pantron I, Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) (express claims presumed material).

[134] *See Kraft, Inc. v. FTC*, 970 F.2d 311, 314, 322-23 (7th Cir. 1992) (implied claims designed to induce purchase are material); *Cyberspace.Com*, 453 F.3d at 1201 (misleading impression created by a solicitation is material); *FTC v. Stefanchik*, No. C04-1852, 2007 WL 1058579, at *5 (W.D. Wash. April 3, 2007), *aff'd* 559 F.3d 924 (9th Cir. 2009) ("Implied claims are presumptively material where there is evidence that the seller intended to make the claim go to the heart of the solicitation or the characteristics of the product or service offered.").

[135] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *Cyberspace.com*, 453 F.3d at 1200.

[136] *See, e.g.*, *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 422 (9th Cir. 2018) (actual deception not required).

[137] *See supra* Sections III and IV; *see FTC v. Cyberspace*, No. COD-1806, 2002 WL 32060289, at *3 n.5 (W.D. Wash. July 10, 2002), *aff'd* 453 F.3d 1196 (9th Cir. 2006) (consumer complaints admissible to show truth of matters asserted).

representation that Defendants would provide financial aid or apply for financial aid on consumers' behalf.[138] Consumers also complained that they applied because they believed Defendants would provide targeted financial aid opportunities based on individualized searches for consumers based on representations in the letter.[139] And consumers complained that they applied because they worried that if they did not apply before the filing deadline they would lose out on valuable financial aid opportunities.[140]

Further, the undisputed evidence in Sections II & III establishes that Defendants' representations were likely to mislead consumers acting reasonably under the circumstances. It is presumptively reasonable for a consumer to rely on an express claim made by a marketer,[141] and consumers' reliance on implied claims is also presumptively reasonable where the seller's false claims go to the heart of the solicitation or the characteristics of the product or service offered.[142] Here, the heart of the solicitation is the substance of Defendants' financial aid program (i.e., what Defendants would actually provide) and whether students had to apply by the deadline or risk losing aid. Defendants made three misrepresentations in their solicitation: (1) that they offered a "program" through which consumers could apply for financial aid or through which Defendants would "apply for the maximum merit and need-based financial aid programs" on behalf of consumers; (2) that their program would provide "targeted financial aid opportunities" or "conduct extensive searches to match students' qualifications and background to financial aid programs;" and (3) that consumers "must" send their applications in by the

---

[138] UF ¶¶ 34, 57; *see also supra* Section IV.

[139] UF ¶¶ 35, 57; *see also supra* Section IV.

[140] UF ¶ 36; *see also supra* Section IV.

[141] *FTC v. Five-Star Auto Club*, 97 F. Supp 2d. 502, 528 (S.D.N.Y. 2000) ("Consumer reliance on express claims is … presumptively reasonable").

[142] *FTC v. Figgie Intern., Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) ("Requiring proof of subjective reliance . . . frustrate[s] the statutory goals . . ."); *see Stefanchik*, 2007 WL 1058579 at *5; *FTC v. Sec. Rare Coin & Bullion*, 931 F.2d 1312 (8th Cir. 1991).

filing deadline to participate and if forms are late "not all funds will be available."[143] Defendants also used language and formatting similar to that used by the Department of Education and school financial aid offices that bolstered these impressions, further demonstrating that consumers' reliance was reasonable.

### E. Restitution, Injunctive Relief, and Penalties against Defendant Aria are Appropriate Here

The remedies available under the CFPA include restitution, injunctive relief, and civil money penalties.[144] Courts in this Circuit have found the appropriate measure of restitution, in the context of the CFPA, is the full amount lost by consumers, which is the amount paid to Defendants less any refunds.[145] Defendants' expenses need not be deducted from a restitution award and restitution need not be limited to defendants' profits.[146] Because the same violative conduct was undertaken by Defendant Aria and Global, but Global defaulted, the Bureau seeks the same restitution, injunctive relief, and civil money penalties here against Aria and in the default motion against Global and for any restitution, or civil money penalty to be assessed jointly and severally so either party can satisfy it.[147]

The Bureau seeks judgment against Aria for $4,738,028 in restitution to

---

[143] *See supra* Section II; *see also* UF ¶ 18; **SJX 25**.

[144] 12 U.S.C. §§ 5565(a)(1) and (2).

[145] *CFPB v. Gordon*, 819 F.3d 1179, 1195 (9th Cir. 2016); *see also CFPB v. Siringoringo*, No. SACV 14-01155 JVS (AWx) at *6 (C.D. Cal. Oct. 26, 2016); *Figgie*, 994 F.2d at 606-607; *FTC v. Stefanchik*, 559 F.3d 924, 931-932 (9th Cir. 2009).

[146] *See FTC v. Wells,* 385 F. App'x. 712, 713 (9th Cir. 2010) (finding consumer loss "an appropriate measure of restitution under the [FTCA]. . . and a district court need not exclude costs incurred in carrying out unfair practices from the restitution order").

[147] *See Gordon*, 819 F.3d at 1196 (affirming decision to hold individual and company jointly and severally liable for the full amount of sales because, *inter alia*, the individual participated in the deceptive practices or had authority to control them); *FTC v. Commerce Planet*, 815 F.3d 593, 600 (9th Cir. 2016) ("if an individual may be held personally liable for corporate violations . . . nothing more need be shown to justify imposition of joint and several liability for the corporation's restitution obligations.").

consumers. This amount is the undisputed sum paid by 76,000 consumers who purchased Defendants "program" based on misrepresentations in Defendants' solicitation letters, $4,783,064, less $45,036 in refunds from 715 consumers identified by Aria.[148] Any amounts unclaimed by consumers should not revert to Defendants.

The Bureau also seeks injunctive relief necessary to protect the public against any future fraud. Specifically, the Bureau seeks to permanently ban Aria from marketing, selling, or providing, or assisting others in the marketing, selling or providing, student financial aid advisory services. A permanent injunction is justified when there is a "cognizable danger of recurrent violation" or some reasonable likelihood of future violations.[149] Here, Defendants' lengthy history of prior illegal conduct is highly suggestive of the likelihood of future violations.[150] The Bureau also seeks to prohibit Aria from making marketing misrepresentations relating to consumer financial products or services and to put various compliance monitoring and reporting provisions in place to ensure compliance with any ban requirements and other permanent injunctive provisions imposed by this Court.[151]

Finally, the Bureau seeks a civil money penalty as authorized by the CFPA. The CFPA provides for three tiers of civil money penalties based on the defendant's scienter. Each tier sets a maximum penalty for each violation.[152] The statutory maximums are $1,176,638 per violation if Defendant acted "knowingly," $29,416 if Defendant acted

---

[148] UF ¶ 65; *see also* UF ¶ 64.
[149] *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (May 25, 1953); *CFTC v. Co. Petro. Mktg. Group, Inc.*, 502 F. Supp. 806, 818-819 (C.D. Cal. 1980).
[150] *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). Moreover, Defendant is a recidivist, and as discussed in Section IV, the warning on the BBB website's use of the term "current violation" suggests ongoing conduct. UF ¶ 63; **SJX 60**, BBB Website.
[151] The Bureau stands ready to submit a draft order addressing both the Bureau's motion for default judgment against Defendant Global and its motion for summary judgment against Defendant Aria, or a proposed order addressing only Defendant Aria at the Court's request.
[152] 12 U.S.C. § 5565(c)(2).

"recklessly," and $5,883 otherwise.[153] The Defendants conceded depositing checks from at least 76,000 consumers, for a total of 76,000 violations.[154] Even at the lowest level of scienter, the maximum penalty is well over $100,000,000.

The CFPA sets forth mitigating factors that the Court should consider when determining the amount of penalties to impose.[155] None of these factors significantly favors reducing the amount of civil money penalties: Aria has refused to provide an updated and sworn statement about his financial resources, and there is therefore no basis to determine if mitigation is necessary on that basis. Aria has not acted in good faith, as he continued to make misrepresentations until this lawsuit was filed; the gravity of Defendant's conduct and risks to consumers are significant because Defendant's actions cost consumers millions of dollars and they preyed on individuals who were seeking assistance to pay for their college educations. Aria is also a recidivist—in 2011 the Better Business Bureau revoked his certification and then in 2015 he entered into a settlement with the Iowa Attorney General's office banning him from conducting business within state lines based on the same misrepresentations at issue here. Notwithstanding the absence of facts supporting significant mitigation, the Bureau's position is that a penalty in the full amount authorized by the statute is not necessary to punish the wrongdoing at issue or achieve appropriate deterrence. The Bureau requests that the Court impose civil money penalties against Aria of $10 million.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of the Bureau on its Counts I-III, order injunctive relief and remediation, and require Aria to pay a $10 million-dollar civil penalty.

---

[153] *Id.*
[154] Def.'s Am. Answer, ECF No. 9 at 36:5-6; UF ¶ 65.
[155] 12 U.S.C. § 5565(c)(3).

1

2

3

4

5

6

7

8

9

10

11

12

Dated: August 21, 2020

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,


John C. Wells
Deputy Enforcement Director

James T. Sugarman
Assistant Litigation Deputy

/s/ Nina Schichor
Nina Schichor, MD Bar
(MD Bar Does Not Issue Bar Numbers)
(E-mail: nina.schichor@cfpb.gov)
(Phone: 202-435-9770)
Amanda C. Roberson, MN Bar 0398511
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2020, I electronically filed the foregoing document via ECF and emailed a courtesy copy to pro se Defendant Armond Aria and Defendant Global Financial Support, Inc., at the email address confirmed by Mr. Aria, ariaarmond@gmail.com and to the court at efile_goddard@casd.uscourts.gov.

/s/ Nina Schichor
Nina Schichor
*Enforcement Attorney*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552