1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  CONSUMER FINANCIAL PROTECTION BUREAU, | Case No.:  15-cv-2440-GPC-AHG |
| 12 | **ORDER:** |
| 13              Plaintiff, | |
| 14  v. | **1. GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND** |
| 15  GLOBAL FINANCIAL SUPPORT, INC., d/b/a STUDENT FINANCIAL RESOURCE CENTER, d/b/a COLLEGE FINANCIAL ADVISORY; and ARMOND ARIA, a/k/a ARMOND AMIR ARIA, individually, and as owner and CEO of Global Financial Support, Inc., | |
| 16 | **2. GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** |
| 17 | |
| 18 | **[ECF Nos. 106, 107]** |
| 19 | |
| 20              Defendants. | |

21         Pending before this Court are Plaintiff Consumer Financial Protection Bureau

22  ("CFPB")'s (1) Motion for Partial Summary Judgment against Defendant Armond Aria

23  ("Mr. Aria"), and (2) Motion for Default Judgment against Global Financial Support, Inc.

24  ("Global").  ECF Nos. 106, 107.  Defendant Mr. Aria filed a Response to CFPB's Partial

25  Summary Judgment Motion, ECF No. 112, and CFPB filed a Reply, ECF No. 113.  For

26  reasons discussed below, the Court (1) **GRANTS IN PART and DENIES IN PART**

27                                          1

28

1  Plaintiff's Motion for Partial Summary Judgment against Mr. Aria; and (2) **GRANTS**

2  Plaintiff's Motion for Default Judgment against Global.

3  I.  **BACKGROUND**

4      A.  **Factual Background**

5          1.  **Identity and Nature of the Defendants**

6      Global is a California corporation that was in business from 2005 to 2016.  Def.'s

7  Opp'n 2, ECF No. 112.  Global used "College Financial Advisory" as its d/b/a name from

8  February 2005 through June 2011, and used "Student Financial Resource Center" as its

9  d/b/a name afterwards through 2016.  *Id.*  The precise nature of Global's service is

10  disputed, but Mr. Aria acknowledges that Global provides a "financial aid guidebook" to

11  its consumers "to help students learn about aid opportunities other than federal student

12  loans."  *Id.* at 1, 3.  The service is provided in exchange for a $59–78 fee, in which the

13  fee varied depending on the year.  Def.'s Resp. to Pl.'s Statement of Undisputed Facts

14  ("UF") No. 15, ECF No. 112-1.

15      Mr. Aria is the founder, owner, CEO, and registered agent of Global.  *Id.*, UF No.

16  3.  He also represented himself in Global's corporate filings as the President and CEO of

17  Global's two fictitious entities, College Financial Advisory and Student Financial

18  Resource Center.  *Id.*  He has overseen every aspect of the company's financial and

19  business operations.  *Id.*, UF No. 6.  This includes: purchasing lists of student contact

20  information from online vendors; creating solicitation packets that are sent to consumers;

21  depositing consumers' checks; and creating the booklets and ensuring they are sent out to

22  paying consumers.  *Id.*

23          2.  **The Solicitation Packets**

24      From 2011 to 2015, Defendants sent solicitation packets to 3.9 million potential

25  consumers who were students (both high school seniors and students enrolled in college)

26  / / /

27

28

and their families. *Id.*, UF No. 14;[1] Def.'s Opp'n 1, ECF No. 112.  Mr. Aria identified these consumers by purchasing lists of student information from online vendors.  UF No. 16, ECF No. 112-1.  Each solicitation packet included: (1) a solicitation letter, (2) an information sheet, (3) a "Student Aid Profile Form," and (4) a return envelope.  OSJX A1–A6,[2] ECF No. 112-4; *see also* UF No. 18, ECF No. 112-1.

As an identifier, the solicitation packet utilized a seal/logo to identify Global's business, including the use of the seal/logo as a watermark.  OSJX A1–A6, ECF No. 112-4.  The seal design was modified after Global changed its d/b/a name from "College Financial Advisory" to "Student Financial Resource Center," but the two relevant designs are provided below:

 

OSJX C16, C17, ECF No. 112-6.

The precise wording in the solicitation packets varied depending on the year that it was sent, but the contents have remained largely the same.  At the top of the letter there were several labels/columns, listing "Student Profile Number," "College Attending," "Filing Status," and "Filing Deadline."  OSJX A1–A6, ECF No. 112-4.  The Student

---

[1] Mr. Aria's evidentiary objections based on admissibility are overruled for reasons discussed *infra* Section II.B of this Order.

[2] While the Court could not identify when the parties ever defined the acronyms "SJX" and "OSJX," the Court presumes that they refer to "Summary Judgment Exhibit" and "Opposing Summary Judgment Exhibit," respectfully.

3

Profile Number, at least according to Mr. Aria, is what Global uses to "organize[] and keep[] track of its consumers." Def.'s Opp'n 14–15, ECF No. 112. The "College Attending" column occasionally listed the name of the school that the potential consumer attended, particularly when such information was available. *See, e.g.*, SJX 14 (Decl. of Oren Lilly) at ¶ 3, ECF No. 106-16. Absent a specific school listed, the column was filled as "Open – All Colleges." *See, e.g.*, OSJX D6 (Decl. of Kiara Cooper), ECF No. 112-7. Regarding "Filing Status," Mr. Aria admitted that it was always listed as "pending." UF No. 29, ECF No. 112-1. The "Filing Deadline" listed varied by the year, but the "deadline" was, according to Mr. Aria, meant to be an internal deadline and not an actual deadline for federal student aid. *Id.*

The introductory paragraph for the letters in 2011 through 2015 generally stated the following:

> It is time to apply for all available [corresponding academic year] financial aid programs to help pay for your college education expenses. Students who did not qualify for federal student aid (Pell Grants, FSEOG, or Work-Study) or need additional financial aid assistance should submit applications to other existing financial aid programs.

OSJX A1, ECF No. 112-4.

The wording of the 2016 solicitation letter's introductory paragraph differed a bit more than that of the other years, but not by too much. Specifically, the introductory paragraph stated the following:

> The 2016-2017 merit and need-based financial aid programs are now available to all college students to help them pay for their education. Students who did not qualify to receive federal aid (***i.e., Pell Grants, FSEOG, or Work-Study***) or students who need additional financial aid should apply to other existing free financial aid programs.

OSJX A6, ECF No. 112-4 (alteration of font in original).

/ / /

The third paragraph of the solicitation letter asked potential consumers to "submit" the Student Aid Profile Form "to proceed" with the student aid program and "apply for" the "financial aid programs." Specifically, the third paragraph in the solicitation letters were worded as follows:

1.  In 2011: "Submit the enclosed Student Aid Profile Form (SAPF) to proceed with the 2011-2012 College Financial Advisory (CFA) student aid program and apply for the maximum merit and need-based financial aid programs."

2.  From 2012 through 2015: "Submit the enclosed Student Aid Profile Form (SAPF) to proceed with the [corresponding academic year] Student Financial Resource Center (SFRC) program and apply for the maximum merit and need-based financial aid programs. The funds from these financial aid programs are not student loans and do not have to be repaid later."

3.  In 2016: "All students may complete and submit the enclosed Student Profile Form as instructed so that Student Financial Resource Center (SFRC) can match students' qualifications and background to broadly available 2016-2017 free merit and need-based financial aid programs. The funds provided through SFRC's exclusively selected financial aid programs are not student loans and do not need to be repaid. [a footnote is attached to the terms 'Student Profile Form' and '(SFRC),' and the footnote states: 'SFRC is an independent organization']"

OSJX A1–A6, ECF No. 112-4.

All solicitation letters encouraged potential consumers to "apply early." *Id.* In 2011, the letter listed "1-888-4-APPLY-NOW (1-888-427-5966)" for Global's contact

phone number.  From 2012 through 2015, the letter listed "1-888-730-APPLY (1-888-730-2775)" instead.  The solicitation letter for 2016 provided the same 1-888-730-2775 phone number but did not explicitly reference "apply" as part of the number.  *Id.*

Relatedly, all the letters listed a deadline for the receipt of the Student Aid Profile Forms.  All solicitation letters state that Global "must receive all completed Student Aid Profile Forms no later than" the deadline specified each year.  *Id.*  However, as previously noted, Mr. Aria claimed that this deadline was an internal deadline and not an actual deadline for federal student aid.  However, Defendant never kept track of the late forms.  All late forms accompanied by a fee were processed just as those submitted before the listed deadline.  UF Nos. 29, 30, ECF No. 112-1.

The specific department in Global that "must receive" the Forms varied by the year.  In 2011, it was "the College Financial Advisory Processing Center Department."  In 2012 and 2013, it was "the SFRC [Student Financial Resource Center] Processing Department."  In 2014 and 2015, it was "the SFRC Processing Division."  And in 2016, it was "the Student Financial Resource Center."  OSJX A1–A6, ECF No. 112-4.

Placed in between the letter and the Student Aid Profile Form was an information sheet.  The sheet each year contained the following information: (1) an introduction to College Financial Advisory or Student Financial Resource Center, depending on Global's d/b/a name of the year; (2) Global's contact information; (3) instructions on the Student Aid Profile Form and the types of questions that the Form will ask; and (4) a disclaimer footnote.  *Id.*  In 2015 and 2016, Global added information that it will take approximately four to six weeks to "process" the Student Aid Profile Form.  OSJX A5, A6, ECF No. 112-4.  In 2016, Global also added an "FAQ" section, which addressed the following questions: (1) whether students should pay to fill the Free Application for Federal Student Aid ("FAFSA"); (2) how Federal Student Aid differs from Global; (3) the company's

/ / /

refund policy; and (4) whether students were required to fill the Student Aid Profile Form.  OSJX A6, ECF No. 112-4.

The footnotes in the information sheet generally included three disclaimers.  First, Global stated that the Student Profile Number was for internal use.  Second, Global stated that it is not affiliated with any educational institutions or government agencies.  Third, Global stated that the default filing status listed at the top of the letter is "pending."  *See* OSJX A1–A6, ECF No. 112-4.  In 2016, these disclaimer footnotes were modified slightly.  Specifically, Global removed the filing status disclaimer and instead disclaimed that the "deadline" listed in the letter is a predetermined, internal deadline set by Global itself.  Global retained the disclaimers on the Student Profile Number and how the company is not affiliated with any government agency or educational institution.  OSJX A6, ECF No. 112-4.

The wording in the Student Aid Profile Form also varied depending on the year, but the Form generally asked potential consumers the same questions.  The questions were grouped in different sections.  First, the "Personal Information"[3] section asked the potential consumer's name, address, date of birth, telephone number, email address, marital status, sex, and the "Student Profile Number" provided by Global.  Second, the "Educational Information" section asked the potential consumer's current school, expected enrollment status, educational goals, GPA, type of college the prospective consumer is planning to attend, and majors or careers the prospective consumer is considering.  Third, the "Background Information" section asked the potential consumer's race/ethnicity, extracurricular activities, and work experience.  Prior to 2015,

---

[3] The Court is aware that there is no section explicitly labeled "Personal Information" in the form for the 2016 solicitation packet.  Rather, the same set of questions come before the section that is labeled "Section II: Educational Information."  *Compare* OSJX A6, ECF No. 112-4, *with* OSJX A1–A5, ECF No. 112-4.

1    this section also asked if/where the prospective consumer served in the military.  Lastly,
2    fourth, the "Parents Information" section asked the potential consumer's parents'
3    occupation(s), and if/where the parents served in the military.  OSJX A1–A6, ECF No.
4    112-4.

5    At the end of the questions, the Student Aid Profile Form had a signature section.
6    From 2011 to 2015, the Forms required a "Preparer's Signature" to "certify that all of the
7    information on this form is true and complete to the best of my knowledge."  OSJX A1–
8    A5, ECF No. 112-4.  The 2016 Form changed the signature section's wording to the
9    following: "I hereby confirm that the information provided on this form is true and
10   complete to the best of my knowledge."  OSJX A6, ECF No. 112-4.  The signature
11   section also included a statement that Global is "unable to guarantee results and has no
12   input into the decision as to which applicants will be selected to receive financial aid
13   funds and it is not affiliated with any educational institutions, government agencies or
14   funding sources," OSJX A1, ECF No. 112-4, with a slight variation in wording
15   depending on the year.

16   Generally, the solicitation packets indicated that Global's products will vary based
17   on the information provided in the Student Aid Profile Form.  For example, at the end of
18   all the Student Aid Profile Forms it states that Global "will strive to provide as many
19   targeted financial aid opportunities as possible to each and every student."  OSJX A1–
20   A6, ECF No. 112-4.  In addition, in the 2015 and 2016 solicitation letters, Global has
21   stated that it "matches" the students' profile with financial aid programs.  The 2015 letter
22   specifically states that the company "conducts extensive searches to match student's
23   qualifications and background to key federal, state, local, and private financial aid
24   programs that are both merit and need-based."  The 2016 letter states that Global "can
25   match students' qualifications and background to broadly available 2016-2017 free merit
26   and need-based financial aid programs."  This is reiterated in the letter's FAQ section, in

27
28

which the language closely resembles the statement in the 2015 letter.  The only difference is that the 2016 version replaced "extensive searches" with "general searches."  OSJX A5, A6, ECF No. 112-4.

In addition, the solicitation packets referred to "processing" the potential consumers' responses.  From 2011 to 2015, the letters referred to the department receiving the Forms as a "Processing Center," "Processing Department," or "Processing Division," and the payments as a "processing fee."  OSJX A1–A5, ECF No. 112-4.  The 2016 letter itself does not include the term "processing."  Instead, the 2016 Student Aid Profile Form asks the potential consumer to pay the "processing fee," and the information sheet states that "SFRC will require approximately four to six (4-6) weeks to process your Student Profile Form."  OSJX A6, ECF No. 112-4.  This language is similarly found in the 2015 packet's information sheet.  OSJX A5, ECF No. 112-4.

### 3.  The Product and Aftermath

Defendants obtained at least $4,783,064 in fees from at least 76,000 consumers who responded to the solicitation packets between 2011 and October 2015.  UF No. 65, ECF No. 112-1.  The only product that consumers received in return was a booklet— Defendants never applied for financial aid on behalf of consumers or contacted any person to apply for any financial aid on behalf of consumers.  *Id.*, UF Nos. 42, 43.

The parties disagree on the nature of the booklets' contents.  According to Mr. Aria, these booklets "contain[ed] essential financial aid information, a list of free merit- and need-based financial aid programs, and clear instructions on how to apply to the specifically selected sources—all in one convenient, multipurpose package."  However, according to CFPB, the booklets "contained general advice about applying for financial aid and information . . . at least some of which was obtained from websites, books, and other publications."  *Id.*, UF No. 39.

/ / /

Of note, these booklets were created and designed "at a group level" and were not individually tailored to the consumers. *Id.*, UF No. 45.  In addition, with a single exception (one in which the deadline had likely passed), the booklets did not include the application deadlines for the scholarships listed in the booklet. *Id.*, UF No. 41.  And sometimes consumers' checks were deposited but Defendants failed to send a booklet to the consumers.  SJX 23 (Decl. of Ryan Thomas) at ¶ 27, ECF No. 106-25.

Over 230 consumers filed complaints about Defendants on the Consumer Sentinel Network, which is a consumer complaint database owned and administered by the Federal Trade Commission.  SJX 58, ECF No. 106-61.  Over 175 complaints were also filed with the Better Business Bureau from January 2008 to December 2015.  SJX 23 (Decl. of Ryan Thomas) at ¶¶ 23–26, ECF No. 106-25.  In addition, consumers complained to colleges and universities, many of which posted public warnings and called what Defendants offered a "scam." *See, e.g.*, SJX 32, ECF No. 106-34.

According to declarations submitted by enforcement investigators of the CFPB and some of the consumers, consumers believed that Defendants would help them apply for financial aid, or at minimum provide targeted financial aid opportunities that would be matched to their specific qualifications and background.  They were frustrated when these expectations were not met. *See, e.g.*, SJX 22 (Decl. of John Zelinsky) at ¶¶ 3, 4, ECF No. 106-24; SJX 7 (Decl. of Jennifer Amendola) at ¶ 3, ECF No. 106-9.  Some consumers wrote that they believed they needed to file by the deadline contained in the letter or risk losing financial aid opportunities. *See, e.g.*, SJX 8 (Decl. of Allyson Barrieau) at ¶ 5, ECF No.106-10.

The Washington State Attorney General's Office initiated an investigation against Defendants.  Ultimately however, Defendants were informed on May 15, 2015 that the State of Washington decided to take no further action and to not go forward with filing any claims.  OSJX J6, ECF No. 112-13.

The Iowa Attorney General's Office also initiated an enforcement action, which ultimately resulted in a compliance agreement.  *See* OSJX I1, ECF No. 112-12.  Under the compliance agreement that was signed on October 8, 2015, Global agreed to pay $25,000 to Iowa's consumer fraud enforcement fund and "refrain" from the "lease, sale, advertisement, or other marketing of any nature of any merchandise . . . to Iowa residents or from an Iowa location."  *Id.*

### B.    Procedural Background

CFPB filed its Complaint on October 29, 2015.  ECF No. 1.  The case was stayed on May 17, 2016 due to a pending criminal investigation of Mr. Aria.  Order Granting Mot. to Stay, ECF No. 34.  The Court lifted the stay on May 27, 2019, stating that the "possibility that the civil proceedings will hamper the Defendants' ability to defend in an inchoate criminal proceeding speculative and unripe."  Order Extending Stay for 30 Days and Lifting Stay, ECF No. 73.

On July 12, 2019, the Court granted then-defense counsel's motion to withdraw as counsel for all Defendants and ordered Global to secure substitute counsel within 30 days.  Order Granting Mot. to Withdraw, ECF No. 79.  Global failed to secure counsel, and on January 30, 2020, the Clerk of Court entered Default against Global for failure to defend itself in action.  ECF No. 90.

During discovery, Mr. Aria invoked his Fifth Amendment privilege against self-incrimination in response to CFPB's questions on his/Global's business practices, including how the booklets were created, or how the contents of the booklets were tailored to students based on their responses to Defendants' solicitations.  Instead, Mr. Aria stated that he already produced documents relating to his internal business process to the Washington and Iowa Attorney General's Offices, and provided them in the record for this Court.  UF No. 48, ECF No. 112-1.

/ / /

Specifically, CFPB requested "All Documents Relating to Your process for receiving the Student Aid Profile Form, recording student information, and creating and sending booklets to consumers."  SJX 3 (Def.'s Suppl. Resps. to Pl.'s 2d Req. for Production) at 7, ECF No. 106-5.  And in response, Mr. Aria (1) objected to producing documents "that are almost ten 10 years old and he is no longer in control, custody or possession of the requested documents"; (2) objected to revealing "student information"; and (3) invoked his Fifth Amendment privilege.  *Id.* at 7–8.  Rather, Mr. Aria "will produce documents that were already sent to other entities," and "expressly reserves the right to supplement, clarify, revise, or correct any or all his responses and objections, and to assert additional responses or objections at a later date."  *Id.*  When CFPB requested "All Documents and Communication Relating to work You perform after receiving a Student Aid Profile Form and/or a 'refundable processing fee," Mr. Aria submitted a similar response, and stated: "The Pro Se Defendant did not have a documented process or procedures and he did not keep track of communication with his Consumers. Therefore, there are no available documentations to produce."  *Id.* at 8–9.

This response was the same during Mr. Aria's May 21, 2020 deposition when CFPB asked about Global's internal business processes and how, if ever, these booklets' contents differed based on the consumers' responses in the Student Aid Profile Form. For example, at the beginning of the deposition Mr. Aria stated that he will be invoking his Fifth Amendment privilege and will not be answering "any internal business process questions, such as . . . how booklets, guidebooks were created, produced, printed, or mailed."  SJX 6 (Dep. of Mr. Aria) at 14–15, ECF No. 106-8.  In addition, CFPB asked in part about the nature of the "group level" booklets, how many different categories or subcategories of information existed for the booklets, whether there was any variation in the categories other than what the CFPB was aware of (life sciences and medicine, preprofessional, liberal arts, art design and performance studies, athletic, military,

employer, minority, and clubs), and "all scholarship information" and "deadline information" in the booklets.  And each time, Mr. Aria refused to answer CFPB's questions on Fifth Amendment grounds.  *Id.* at 52–57.

On August 24, 2020, CFPB filed its Motion for Partial Summary Judgment against Mr. Aria and Motion for Default Judgment against Global.[4]  ECF Nos. 106, 107.  Mr. Aria filed a Response in Opposition to the Motion for Partial Summary Judgment on September 24, 2020.  ECF No. 112.  CFPB filed its Reply on October 9, 2020.  ECF No. 113.  No Defendant has filed an opposition to CFPB's Motion for Default Judgment.

## II.  SUMMARY JUDGMENT

### A.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material when it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The initial burden of establishing the absence of any genuine issues of material fact falls on the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *See id.* at 322–23.

Once the moving party has satisfied its initial burden, the non-moving party cannot rest on the mere allegations or denials of its pleading.  The non-moving party must "go

---

[4] Contrary to Mr. Aria's objection, *see* Def.'s Opp'n 1 n.3, ECF No. 112, CFPB's motion is in fact a motion for partial summary judgment and the Court will treat it that way.  The whole point of a summary judgment is to avoid jury trial on issues with no genuine disputes of material fact.

beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. "'[C]onclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence,' are insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (alterations in original) (citing *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). In determining whether there are any genuine issues of material fact, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001) (citation omitted).

### B.    Evidentiary Disputes

The Court first quickly addresses Mr. Aria's evidentiary objections. To the extent that the objected-to evidence is admissible and relied-on, the Court overrules the objections. And to the extent that the objected-to evidence is not referenced in this Order, the Court overrules the objections as moot. In sum, Mr. Aria's evidentiary objections lack merit. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

Specifically, Mr. Aria argues that some of CFPB's evidence is inadmissible because they are not properly authenticated. Def.'s Opp'n 21–22, ECF No. 112. Mr. Aria is relying on old law. *See, e.g.*, *Del Thibodeau v. ADT Sec. Servs.*, No. 16CV02680-GPC-AGS, 2018 WL 637947, at *1 n.2 (S.D. Cal. Jan. 31, 2018), *reconsideration denied sub nom. Thibodeau v. ADT Sec. Servs.*, No. 16CV02680-GPC-AGS, 2018 WL 1791695 (S.D. Cal. Apr. 16, 2018) (discussing how the 2010 amendments to the Federal Rules of Civil Procedure effectively abrogated the requirement that documents supporting summary judgment must be authenticated); *see also Fraser*, 342 F.3d at 1036 (focusing on the admissibility of the evidence's contents rather than form).

1    Mr. Aria also repeatedly argues that certain evidence should not be considered
2  because it is "time-barred" or outside the "relevant period."  *See, e.g.*, Def.'s Opp'n 20,
3  ECF No. 112; UF Nos. 1, 12, ECF No. 112-1.  This is legally incorrect.  Evidence on
4  time-barred conduct may still be admissible when it is "relevant" to assess conduct that is
5  not time-barred.  *See Lyons v. England*, 307 F.3d 1092, 1109–10 (9th Cir. 2002).
6  Regardless, CFPB's action is not time-barred because 12 U.S.C. § 5564(g) clearly states
7  that the action must be brought within three years "after the date of discovery of the
8  violation," and Mr. Aria presents no argument—let alone support of it—that CFPB
9  "discovered" Global's violation before October 29, 2012 (three years before October 29,
10 2015 when CFPB filed this lawsuit).

11    **C.    Discussion**

12         **1.    CFPB's Enforcement Authority**

13    Mr. Aria challenges CFPB's authority to bring this enforcement action.  Def.'s
14 Opp'n 7–11, ECF No. 112.  Under the Consumer Financial Protection Act of 2010
15 ("CFPA" or "Act"), CFPB has authority to take an enforcement action against a "covered
16 person" or "service provider" to prevent unfair, deceptive, or abusive acts or practices "in
17 connection with any transaction with a consumer for a consumer financial product or
18 service, or the offering of a consumer financial product or service."  12 U.S.C. § 5531(a).

19    Mr. Aria argues that Global never provided or offered a "consumer financial
20 product or service."  Def.'s Opp'n 7–11, ECF No. 112.  The Act defines the term
21 "consumer financial product or service" in relevant part as a "financial product or service
22 that is described in one or more categories under . . . paragraph (15) and is offered or
23 provided for use by consumers primarily for personal, family, or household purposes."
24 12 U.S.C. § 5481(5).  Relatedly, "paragraph (15)" defines "financial product or service,"
25 which lists a variety of activities or products that qualify.  *Id.* § 5481(15).  The parties
26 / / /

27
28

agree, *see* Pl.'s Mem. for Partial Summ. J. 16 nn.104, 105, ECF No. 106-1; Def.'s Opp'n 8 n.50, ECF No. 112, that the relevant provision at issue for the Court is the following:

> [Including the term "financial product or service" to mean:] providing financial advisory services [other than securities] to consumers on individual financial matters or relating to proprietary financial products or services (other than by publishing any bona fide newspaper, news magazine, or business or financial publication of general and regular circulation, including publishing market data, news, or data analytics or investment information or recommendations that are not tailored to the individual needs of a particular consumer) . . . .

12 U.S.C. § 5481(15)(A)(viii).

Based on 12 U.S.C. § 5481(15)(A)(viii) as applied to the facts, the Court concludes that Global's booklets constitute a "financial product or service," and by extension a "consumer financial product or service."  In its solicitation packets, Global represented itself as being "devoted to helping students . . . receive the best available free merit and need-based financial aid."  *See, e.g.*, OSJX A5, ECF No. 112-4.  To do so, Global stated that it "conducts extensive searches to match student's qualifications and background to key federal, state, local, and private financial aid programs."  *Id.*  And supposedly its "financial aid guidebook" offers "clear guidelines" to apply to Global's "specifically selected" financial aid programs.  *Id.*  A "financial aid guidebook" that "specially selects" financial aid programs for its consumers is a "proprietary financial product or service."  In addition, offering a "guideline" clearly is an advisory function, and issues relating to financial aid for colleges clearly qualify as a "financial matter."  Global's d/b/a names as "College Financial Advisory" and "Student Financial Resource Center" identify Global as a financial advisor and financial resource, and consumers reportedly understood it that way.  *See, e.g.*, SJX 13 (Decl. of Paul Lee) at ¶ 8, ECF No. 106-15.

Mr. Aria makes three arguments, all of which fail.  First, Mr. Aria contends that the term "consumer financial services or products" excludes publications.  *See* Def.'s Opp'n 8, ECF No. 112 (defining it as "to provide financial advisory services or products

15-cv-2440-GPC-AHG

that are either individualized or proprietary—excluding publications"). This is an incorrect reading of the statute because the parenthetical exclusion in § 5481(15)(A)(viii) explicitly refers to publications "of general and regular circulation" (such as newspapers and magazines), and those which are "not tailored to the individual needs of a particular consumer." *See* 12 U.S.C. § 5481(15)(A)(viii). As such, the financial aid guidebook does not come within the "general and regular circulation" publication exception.

Second, Mr. Aria contends that Global's product and service—the booklets—were never "individual," "individualized," or "tailored to the individual needs," which is a definitional requirement under the Act. Def.'s Opp'n 8–10, ECF No. 112. Rather, according to Mr. Aria, Global represented that its product would be "targeted" at the "group level," which he claims is distinct from "individualized." *Id.* This argument is meritless. Here, Global sent out its solicitation packets to individuals, with each packet having a unique Student Profile Number. In addition, Global's Student Aid Profile Form asked questions of individual potential consumers, not to a group. Finally, based upon an individual's information, Global represented it would "strive to provide as many targeted financial aid opportunities as possible to each and every student." OSJX A1–A6, ECF No. 112-4. By offering "targeted" scholarship information to "each and every" consumer, Global offered an advisory service "on individual financial matters."

Third and finally, Mr. Aria argues that Global's booklets are not "proprietary" because Global never had or produced any trade secrets, and because Global obtained information from publicly available sources. Def.'s Opp'n 10, ECF No. 112. No part of the definition of "proprietary" requires trade secrets.[5] "Proprietary" means "of, relating to, or involving a proprietor," and "proprietor" means "an owner, esp. one who runs a

---

[5] Mr. Aria is defining the wrong word. *See* Def.'s Opp'n 10 n.67, ECF No. 112. The operative word is "proprietary," not "proprietary information."

business."  Black's Law Dictionary (11th ed. 2019).  Global (and by extension Mr. Aria) owns the booklets, therefore, the booklet is a "proprietary financial product."  Separately, even if Global's information was from publicly available sources, it was Global alone that selected and arranged them in a particular way so that it was proprietary to Global.

Further, the CFPB has enforcement authority over both Defendants because Global's booklet constitutes a "consumer financial product or service," Global is a "covered person," and Mr. Aria is a "related person" under the Act.  The Act defines "covered person" as "any person that engages in offering or providing a consumer financial product or service," 12 U.S.C. § 5481(6)(A), and the term "person" includes corporations, *id.* § 5481(19).  Since Global offered and provided the "consumer financial product or service" of the booklet, it is a "covered person."   The Act further defines "related person" as "any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of, or agent for, such covered person."  *Id.* § 5481(25).  Mr. Aria is the owner, CEO, and registered agent of Global, the "covered person."  Therefore, Mr. Aria is a "related person," and thus treated as a "covered person," pursuant to 12 U.S.C. § 5481(25)(B).

In conclusion, since Global offered and provided the "consumer financial product or service" in the form of a financial aid booklet directed to individual customers, and because Mr. Aria is the owner, CEO, and registered agent of Global, CFPB has authority under the Act to bring this enforcement action against both Global and Mr. Aria.

### 2.	Liability Under the Consumer Financial Protection Act of 2010

Having addressed CFPB's authority to bring this lawsuit, the Court now considers whether Mr. Aria is liable under the CFPA.  The Act prohibits "deceptive" practices relating to any transaction with a consumer for a consumer financial product or service."  *See* 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).  The Act considers a practice "deceptive" if: "(1) 'there is a representation, omission, or practice that,' (2) 'is likely to mislead

consumers acting reasonably under the circumstances,' and (3) 'the representation, omission, or practice is material.'"  *CFPB v. Gordon*, 819 F.3d 1179, 1192–93 (9th Cir. 2016) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)).  To determine whether a representation is deceptive, the Court looks at whether the "net impression" created by the representation is "likely to mislead" the consumers.  *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).  Proof of actual deception is not required.  *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 422 (9th Cir. 2018).

CFPB alleges that Mr. Aria's conduct was deceptive because Defendants misrepresented (1) that they provided a "program" through which consumers could apply for financial aid, or through which Global would apply for financial aid on behalf of the consumers; (2) that they conducted extensive searches to target or match individual consumers with particular financial aid opportunities; and (3) that consumers would lose their opportunity to receive financial aid unless they applied by the deadline specified by Global.  Pl.'s Mem. for Partial Summ. J. 18, ECF No. 106-1.  Mr. Aria argues that CFPB "relies on blatant misquotations and misinterpretations" of Global's solicitation packets and website, and that summary judgment is inappropriate because a genuine dispute of material fact exists.  Def.'s Opp'n 12, ECF No. 112.

The Court concludes that summary judgment is appropriate for the first allegation, albeit only for the solicitation packets ranging from 2011 to 2015.  For the 2016 solicitation packets, a genuine issue of material fact exists as to whether Mr. Aria misrepresented that Global's program permitted consumers to apply for financial aid or to apply through Global.  In addition, summary judgment is appropriate for the other two allegations by CFPB.  Mr. Aria misrepresented to his customers that Global would "target" financial aid opportunities "to each and every student," when in reality, everyone was going to receive a booklet that largely contained the same general information.  Also, Mr. Aria misrepresented a risk of loss in financial aid opportunities if consumers did not

1   pay and submit the Student Aid Profile Form by the deadline specified in the solicitation

2   packet, when in fact, the date of submission was not tied to financial aid opportunities.

3                      **a.      "Program" for Financial Aid**

4          CFPB's Count One alleges that Defendants misrepresented its "program" as

5   something through which either consumers could apply for financial aid, or through

6   which Global would apply for financial aid on behalf of the consumers.  Compl. ¶¶ 71,

7   72, ECF No. 1.  In support of summary judgment on this issue against Mr. Aria, CFPB

8   presented the following: (1) the solicitation packets consistently referred to a "program";

9   (2) Defendants used business names, and formatting (such as a seal similar to that of

10  other educational institutions or government agencies) and language (including explicit

11  references to students' colleges when known) similar to that of institutions that typically

12  provide financial aid; (3) Defendants consistently referred to "processing," "filing

13  deadline," and "apply," and even referred to the booklet as a "financial aid package"; and

14  (4) letters from 2011-2015 informed consumers that they should return the form "to

15  proceed with . . . the program and apply for the . . . financial aid programs."  Pl.'s Mem.

16  for Partial Summ. J. 10–11, ECF No. 106-1.

17         The Court finds that references to "program," use of seals similar to those used by

18  institutions that provide financial aid, and references to terms such as "filing deadlines"

19  and "apply" are consistent with CFPB's view that consumers would likely have been

20  misled to believe that Global would either apply or permit students to apply for financial

21  aid.  In addition, the Court agrees with CFPB that Mr. Aria's self-serving declaration

22  does not create a genuine issue of material fact.  *See, e.g.*, *FTC v. Publ'g Clearing House,*

23  *Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).  The strongest evidence which supports

24  CFPB's position relates to the invitation for consumers to return the forms in order "to

25  proceed with" the program and "apply for" financial aid programs.

26  / / /

27

28

1    Mr. Aria identifies language in the 2016 solicitation packets to create a genuine

2   issue of disputed fact to defeat summary adjudication on the issue.  The Court agrees with

3   Mr. Aria specifically regarding the 2016 solicitation packets.  In Global's 2016

4   solicitation packet, the information sheet includes a separate FAQ section.  And this FAQ

5   section explicitly states that students should not pay to fill out FAFSA.  OSJX A6, ECF

6   No. 112-4.  Viewing this separate FAQ section in the light most favorable to Mr. Aria,

7   there is a genuine issue of disputed fact as to whether the 2016 solicitation packets

8   misrepresented that Global's program permitted consumers to apply for financial aid or to

9   apply through Global.  Global has expressly warned its consumers against someone else

10  applying for financial aid on behalf of them.  This warning is the first question in the

11  FAQ section and is prominently displayed.

12    However, no disclaimers as explicit as the 2016 FAQ section exist in the

13  solicitation packets from prior years.  *See* OSJX A1–A5, ECF No. 112-4.  The other

14  example passages that Mr. Aria provides in support of his position do not convince the

15  Court that a genuine issue of disputed fact exists from 2011 to 2015.  Specifically, the

16  information sheet contained in Global's 2015 solicitation packet states that "SFRC

17  provides students with a comprehensive SFRC financial aid guidebook."  OSJX A5, ECF

18  No. 112-4.  The signature section of the Student Aid Profile Form also had a disclaimer

19  that Global is not affiliated with any educational institution or government agency.[6]  *See,*

20

21  _____

22  [6] The Court is aware that this disclaimer is not conspicuous at all—they are in small font

23  and buried in mounts of other texts. *See FTC v. Cyberspace.Com LLC*, 453 F.3d 1196,
    1200 (9th Cir. 2006) (discussing how disclaimers must be unambiguous).  As such, the

24  Court does not give much weight to the disclaimer that is in the footnote of the
    information sheet.  However, the Court treats the signature section differently because

25  there is a general duty for the signing party to read the terms of the contract.  If the
    consumer is asked to "certify" or "confirm" the personal information, it is reasonable to

26  expect that the person would read the rest of what the Form is asking.  *Cf. Employee*

27

28                                                                 15-cv-2440-GPC-AHG

*e.g.*, OSJX A1, ECF No. 112-4.  But these passages do not correct the program's misrepresentations.  For example, not being a college or government agency does not preclude the possibility of an independent financial application program.  Further, language that "SFRC provides students with a comprehensive SFRC financial aid guidebook" does nothing to disabuse students of reasonable expectations drawn from the Defendants' earlier misrepresentations.

Therefore, the Court concludes that the net impression provided by Global's materials in 2011 to 2015 likely misled consumers to believe that Global offered to assist consumers to apply for financial aid or to apply for aid on behalf of students.  Further, this misrepresentation was material since assistance with the application process would be one reason consumers purchased Global's product.  Accordingly, Plaintiff's motion for summary judgment on Count One is **GRANTED IN PART** as to claims based upon the 2011 to 2015 solicitation packets and **DENIED IN PART** as to the claim relating to the 2016 solicitation packets.

### b.    "Matching" Consumers with Financial Aid Opportunities

Count Two alleges that Defendants misrepresented consumers by giving the impression of conducting "extensive searches to target or match consumers with particular student financial aid opportunities," when in fact such was far from the case. Compl. ¶¶ 73, 74, ECF No. 1.  Mr. Aria avers that no misrepresentation occurred since Global never promised to provide "individualized" booklets, and Global in turn provided "targeted" financial information to consumers.  Def.'s Opp'n 15, ECF No. 112.

The Court agrees with CFPB and concludes that Mr. Aria's representations were likely to mislead consumers to think of the expected product to be tailored to their

---

*Painters' Tr. v. J & B Finishes*, 77 F.3d 1188, 1192 (9th Cir. 1996) (discussing how the signing party is presumed to know the agreement's contents and is thus bound by it).

22

individual circumstances when such was not the case.  And this misrepresentation was material since a tailored financial advice is the reason many consumers purchased Global's product.

CFPB has produced reams of evidence on how the booklets varied little (if at all), and how oftentimes the differences that occasionally existed did not even correspond to the consumer's or the "group's" needs.  Booklets sent between 2011 and 2014 had 20 pages of introductory material and scholarship advice such as providing a "Basic Financial Aid Overview" and advice on "How to Ask for a Recommendation Letter," followed by 25 to 35 pages of information on scholarships that applied to everyone.  *See* SJX 23 (Decl. of Ryan Thomas) at ¶¶ 35–43, ECF No. 106-25.  Only the last 6 pages covered scholarship information for various minority groups, but even this was included without regard to whether the student had indicated that he or she was a member of any minority group.  *Id.*

Mr. Aria once again emphasizes the supposed distinction between "individualized" and "targeted," and argues that Global never promised to provide "individualized" booklets.  *Id.*  This semantic juggling does not impress the Court because the material issue is whether Global represented itself as promising booklets that will vary among individual consumers based on the contents of their Student Aid Profile Form.  Mr. Aria's distinction is predicated on the *degree* of variation, but this essentially concedes that Global was likely to lead potential consumers to believe they would receive "individualized" products.

Indeed, multiple parts of the solicitation packet give the impression that the product will vary based on what the consumer puts in the Student Aid Profile Form.  The 2016 letter asked potential consumers to fill the Form so that Global "can match students' qualifications and background" to various financial aid programs.  OSJX A6, ECF No. 112-4.  The funds would be "exclusively selected financial aid programs."  *Id.*  If the

matching and selection happened regardless of the answers submitted in the Form, the Form would be unnecessary.  Therefore, Global's instructions to fill out a Form were likely to make consumers think that the Form will make a difference in what the consumers receive.

Similarly, the solicitation packets indicated that Global will "process" the Forms and that consumers must submit the Forms to the "processing department," or a similar entity thereof.  *E.g.*, OSJX A1, ECF No. 112-4.  Mr. Aria also admitted that Global "processed" these Forms to "deliver the consumer the *appropriate* Guidebook," Def.'s Opp'n 14, ECF No. 112 (emphasis added), indicating that the "Guidebook" is not a uniform product—some extra step is supposed to occur in-between.  "Processing" the Form implies that something is done with the Form.  The Form requested personal information that would vary by the individual which would lead consumers to believe that individualized information would play a role in processing the Form and the product that was provided to the consumer.

Defendants failed to provide individualized attention to consumers.  In fact, some consumers did not even receive any booklets after their payments.  SJX 23 (Decl. of Ryan Thomas) at ¶ 27, ECF No. 106-25.  In addition, the booklets did not include application deadlines for the scholarships listed in the booklet.  UF No. 41, ECF No. 112-1.  The single exceptional case was one in which the deadline had likely passed.  *Id.*  Numerous consumers filed complaints, many of them expressing that at the bare minimum they were expecting "targeted financial aid opportunities matched to their specific qualifications and background" and that no part of the booklet provided "precise extensive research to match each student's qualification and background to available free merit and need-based financial aid programs," as advertised in the solicitation packets.  *See, e.g.*, SJX 22 (Decl. of John Zelinsky) at ¶ 4, ECF No. 106-24; *see also* SJX 13 (Decl. of Paul Lee) at ¶ 8, ECF No. 106-15 ("I believed [Global] would be like a financial aid

counselor at a school and they would review my information and provide individualized, customized advice about which scholarships to apply to . . . .").

Even granting Mr. Aria's argument that Global had only promised to provide "targeted" financial aid information at the "group level," Mr. Aria has failed to provide any supporting evidence that Global met its own standard. A "targeted" set of financial aid information still implies that the resultant product will differ based on "a particular place or group of people," as Mr. Aria so defines. Def.'s Opp'n 9, ECF No. 112. But in response to CFPB's numerous requests to produce documents on how Global's booklets differed, Mr. Aria produced nearly nothing. On CFPB's request for documents relating to what work Global performs after it receives the completed Student Aid Profile Form and payment, Mr. Aria responded that there were no documented processes or procedures. SJX 3 (Def.'s Suppl. Resps. to Pl.'s 2d Req. for Production) at 8–9, ECF No. 106-5. Otherwise, Mr. Aria invoked the Fifth Amendment.

The one potentially relevant document available on record is Global's own "Description on How the SFRC Guidebook Packages are Created," which is what Global produced during the investigations by the Washington and Iowa Attorney Generals' Offices. OSJX J5, ECF No. 112-13 (Washington); OSJX I3, ECF No. 112-12 (Iowa). This document states that "additional sections are included" in the booklet when applicable—if a "match is found" when the Student Aid Profile Form is compared with the available "information and merit-based financial aid programs," the select information and financial aid programs are supposedly included. *Id.* Yet no additional record exists on how this was done, or if Global even followed through with this process.

Booklets sent between 2014 and 2016 in some instances contained additional information on scholarships for athletes, students with interest in life sciences or pre-professional careers, or military-affiliated students. *See* SJX 23 (Decl. of Ryan Thomas) at ¶¶ 41–43, ECF No. 106-25. However, these categories of information were not

1   provided to all consumers who identified the pertinent characteristics on their form.  To

2   illustrate, CFPB presented evidence that a white male consumer from Vermont who had

3   parents that served in the military received a booklet that did not list relevant military

4   scholarships, but rather an entire section for non-white applicants and a section on state-

5   based contact information unrelated to Vermont.[7]  *Id.*, ¶¶ 40, 41.  A Kentucky consumer

6   received a booklet that was identical, except for the name listed on the booklet.  *Id.*

7          Mr. Aria brushes off the evidence as "fictious complaints" from "disgruntled

8   witnesses."  Def.'s Opp'n 19, ECF No. 112.  The only support to back up his claim,

9   however, is his own declaration.  *See* Decl. of Armond Aria, ¶¶ 185–213, ECF No. 112-2.

10  Mr. Aria's personal viewpoints on what he thinks of the 14 different customers, let alone

11  230 other consumers who filed similar complaints, presents nothing probative to the

12  Court.  His declaration is inadequate for summary judgment, and it does not nullify the

13  consumer declarations either because Mr. Aria provides no personal knowledge as to the

14  declarants' interpretations of the solicitation package.  *See, e.g.*, *Villiarimo v. Aloha*

15  *Island Air, Inc.*, 281 F.3d 1054, 1059 n.2 (9th Cir. 2002) (disregarding declarations that

16  entailed facts beyond the declarant's personal knowledge).

17         Mr. Aria presents several other indirect, conjectural observations to defeat

18  summary judgment.  *See* Def.'s Opp'n 18–21, ECF No. 112.  However, none of them

19  establish a "specific fact" that Global did not misrepresent its potential consumers with

20  its solicitation packet.  First, prior investigation history in other states does not

21  affirmatively prove the absence of guilt.  State enforcement authorities could decide to

22  drop prosecutions for a variety of reasons, such as budget constraints or shifts in

23  _____

24

25  [7] Contrary to Mr. Aria's characterization, Def.'s Opp'n 16, ECF No. 112, these
    "complimentary partial and incomplete" copies were similar to other booklets.  *See* SJX
26  23 (Decl. of Ryan Thomas) at ¶¶ 35–43, ECF No. 106-25.  *Compare* SJX 8 (Decl. of
    Allyson Barrieau), ECF No. 106-10, *with* OSJX I2, ECF No. 112-12.

27                                            26

28                                                                      15-cv-2440-GPC-AHG

enforcement priorities.  And make no mistake, Defendants were banned from ever soliciting in Iowa.  Most importantly, Washington's investigation based on Washington state law has no bearing on Mr. Aria's liability under the CFPA.

Second, Global's supposedly "low complaint rate and refund request rate," even if viewed in the light most favorable to Mr. Aria, are insufficient sources to prove innocence when CFPB has articulated specific episodes of how the solicitation packets misled the consumers.  Consumers elect not to file complaints or request refunds for multiple reasons, many times because this process is quite burdensome.  Regardless, CFPB has presented evidence that when consumers called or reached out, they experienced significant difficulties, which provides some explanation for the "low" complaint rates.  *See, e.g.*, SJX 8 (Decl. of Allyson Barrieau) at ¶ 8, ECF No. 106-10; SJX 18 (Decl. of John Senat) at ¶ 9, ECF No. 106-20.

Third, Mr. Aria's attempt to explain the Better Business Bureau complaints similarly fail for reasons that the Court has already discussed.  Complaint rates alone are not probative.  CFPB has provided sufficient evidence of Defendants' misrepresentations.

Lastly, Global's efforts to craft cease-and-desist letters (and their aftermath) proves nothing.  At best, it shows that each university made its independent decision on whether they wanted to withdraw their warning according to their institutional protocols.  A school administration's actions cannot prove whether Mr. Aria violated a federal law.

Thus, in light of all evidence before the Court, the Court concludes Defendants did not conduct the promised search to "match" consumers' qualifications and background with financial aid opportunities, nor have they ever provided "targeted" financial aid advice, all contrary to what they represented.  In civil proceedings, courts may draw adverse inferences against parties asserting Fifth Amendment privilege. *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911 (9th Cir. 2008).  The court determines whether the value of presenting the evidence is substantially outweighed by the danger of unfair

1  prejudice to the party asserting the privilege.  *Id.* at 912.  There must be substantial need

2  of the information, no other less burdensome way of obtaining the information, and

3  independent evidence of the fact about which the party refuses to testify.  *Id.*

4      Applying adverse inferences, here, is appropriate.[8]  The documents and

5  information that CFPB requested but could not access are important because they would

6  reveal whether the content of the booklets varied depending on what was contained in a

7  consumer's Student Aid Profile Form—beyond Mr. Aria's bare assertion that it did vary.[9]

8  There is minimal danger of unfair prejudice—Mr. Aria presents no legal support as to

9  why being a pro se litigant is a sufficient reason to obstruct discovery without bearing its

10  consequences.  *See SEC v. Colello*, 139 F.3d 674, 678 (9th Cir. 1998) (discussing how by

11  the "initial obstruction of discovery and his subsequent assertion of the privilege,

12  defendant has forfeited the right to offer evidence disputing the plaintiff's evidence or

13  supporting his own denials" (citation omitted)).  There is no other less burdensome way

14  of obtaining the information either, since the relevant documents are under Defendants'

15  custody.  Finally, based on independent evidence, such as the exhibit booklets available

16  to CFPB, investigators' review of the booklets, the solicitation packets, and declarations

17  made by various customers, it has been demonstrated that Defendants' booklets never

18  varied based on the consumers' profile.

19      In conclusion, there is no genuine issue of material fact that the net impression

20  created by Mr. Aria's solicitation packets were likely to mislead reasonable consumers.

21

22

23  [8] The Court does not find it necessary to make an adverse inference to the precise degree
    that CFPB requests, *see* Pl.'s Mem. for Partial Summ. J. 16, ECF No. 106-1.

24

25  [9] If Mr. Aria is instead arguing that there is nothing more to produce regardless of the
    Fifth Amendment privilege, *see* Def.'s Opp'n 24–25, ECF No. 112 ("The Bureau does

26  not have an interest . . . because they *already* have access to that very information."
    (emphasis in original)), then summary judgment is even more appropriate.

27

28

The solicitation packets were likely to mislead the consumers to think that the booklet they would be purchasing would be targeted and varied based on the information they provided in the Student Aid Profile Form, when in reality the Form never mattered, and no specific financial aid advice was ever provided.  Mr. Aria failed to present any admissible evidence to indicate that the solicitation packets were not likely to mislead the consumers.  Therefore, the Court **GRANTS** Plaintiff's motion for summary judgment on Count Two.

### c.    Deadlines

Count Three alleges that Defendants misrepresented to potential consumers that they would be losing their opportunity to receive financial aid unless they paid Global and applied by a specified deadline.  Compl. ¶¶ 77, 78, ECF No. 1.  CFPB has met its evidentiary burden against Mr. Aria.

At the top of each solicitation letter, a deadline was listed, along with a "pending" status.  At the body of the letter, the deadline was bolded and underlined.  *See, e.g.*, OSJX A3, ECF No. 112-4.  The letter presented mandatory language; it stated that potential consumers "must" submit the Student Aid Profile Form by the specified deadline.  The letter also informed students to "apply early," and warned of potential penalties for submitting the Form late by stating that "not all financial aid funds will be available." For a certain period of time Global provided a phone number that spelled "apply now." *See* OSJX A1, ECF No. 112-4.  And of course, parties have established that this "Filing Deadline" was not an actual deadline for federal student aid.  UF No. 29, ECF No. 112-1. Ultimately CFPB provided multiple examples of consumers rushing to pay Global and submit their Student Aid Profile Form, thinking that any delay could jeopardize their financial aid opportunities.  *See, e.g.*, SJX 15 (Decl. of Robert Michalsen) at ¶ 6, ECF No. 106-17.

/ / /

1    Mr. Aria does not deny any of these facts relating to the solicitation packet's

2    design but makes two arguments in response.  First, Mr. Aria argues that this deadline

3    was a "necessary business tool" to close Global's marketing cycle and consumer

4    contracts.  Second, Mr. Aria argues, while Global referenced other financial aid

5    programs' strict deadlines, it never indicated that it had a deadline by which it would

6    provide financial aid or apply on behalf of consumers.  Def.'s Opp'n 16, ECF No. 112.

7        Neither argument is persuasive.  Mr. Aria's argument that the deadline was to close

8    marketing cycles and consumer contracts is once again from a declaration backed by no

9    external evidence.  Decl. of Armond Aria, ¶¶ 91–93, ECF No. 112-2.  And to the

10   contrary, Mr. Aria admitted that Defendants never kept track of the late forms, and that

11   all late forms were processed similarly to those submitted before the deadline.  UF Nos.

12   29, 30, ECF No. 112-1.  These undisputed facts undercut any legitimacy to an

13   unsubstantiated claim that marketing cycles and consumer contracts were a concern to

14   Defendants.

15       In addition, even if there was a legitimate reason to have an internal deadline, that

16   is not a justification for the misrepresentation.  The Court determines whether Mr. Aria

17   was liable for deceptive practices based on whether the conduct was likely to mislead the

18   consumers on a material issue, not whether the conduct or the misleading was justified.

19   *See CFPB v. Gordon*, 819 F.3d 1179, 1192–93 (9th Cir. 2016).  Therefore, as long as

20   CFPB produced evidence that Mr. Aria's representation of the deadline and its apparent

21   urgency induced consumers to pay the processing fee, Mr. Aria misrepresented Global

22   and its product to consumers.

23       Regarding Mr. Aria's second argument, it is true that other financial aid programs

24   have strict deadlines.  The problem, however, arises when this fact is combined with

25   Global's misrepresentation.  Global created an artificial deadline that was untethered to

26   / / /

27

28

any real financial aid program deadline in order to prime and push customers to part with their money and sign up for the Global program.

In conclusion, Mr. Aria's representation of artificial deadlines was likely to mislead consumers to induce immediate or accelerated payment of fees to Global.  In contrast, Mr. Aria failed to provide any evidence that CFPB's factual presentations could be reasonably disputed.  Therefore, the Court **GRANTS** Plaintiff's motion for summary judgment on Count Three.

### 3.   Remedies

CFPB seeks: (1) $4,738,028 in restitution; (2) an injunction to permanently ban Mr. Aria from marketing, selling, or providing student financial aid advisory services, or from assisting others in such; (3) an injunction to prohibit Mr. Aria from making marketing misrepresentations relating to consumer financial products or services, and to put compliance monitoring and reporting provisions in place; and (4) a civil money penalty of $10 million.  Pl.'s Mem. for Partial Summ. J. 23–25, ECF No. 106-1.  The Court has authority under the Act to grant the three remedies requested by CFPB.  12 U.S.C. § 5665(a).

Restitution "is a form of ancillary relief" that a court can order "[i]n the absence of proof of 'actual damages.'"  *FTC v. Gill*, 265 F.3d 944, 958 (9th Cir.2001).  Restitution may be measured by the "full amount lost by consumers rather than limiting damages to a defendant's profits."  *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009).  A district court may use a defendant's net revenues as a basis for measuring unjust gains.  *Gill*, 265 F.3d at 958 ("In the absence of proof of 'actual damages,' the court properly used the amounts consumers paid as the basis for the amount Defendants should be ordered to pay for their wrongdoing.").

Here, CFPB's calculations on both the restitution and civil money penalty are predicated on there being 76,000 consumers and therefore 76,000 violations.  *Id.* at 24–

25.  CFPB demonstrated that Defendants collected $4,738,028 from 76,000 consumers from 2011 through 2016.  Mr. Aria's Response brief is silent on the remedies issue.  Mr. Aria has not expressed any objection to CFPB's restitution and civil penalty calculation; he only challenged the underlying liability.  Accordingly, the Court **GRANTS** summary judgment on the issue of restitution in the amount of $4,738,028 and civil money penalties of $10 million.[10]

In addition, the Court finds it appropriate to issue an injunction to prevent Mr. Aria or Global from committing any future fraud.  Global's solicitations spanned at least six years (2011 to 2016), and Mr. Aria continued his business even after an enforcement action in Iowa.  Thus, there is reasonable likelihood of future violation, which warrants a permanent injunction.  *Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)) (requiring the court to determine "some cognizable danger of recurrent violation" that is "more than the mere possibility" to issue a permanent injunction).  An injunction is appropriate where the Court has summarily found that Mr. Aria engaged in deceptive practices and the Court must make sure that a deceptive practice does not occur again.  Based upon the unopposed calculations provided by CFPB, the Court **GRANTS** summary judgment on CFPB's request for injunctive relief.

/ / /

---

[10] The fact that this Court declines summary judgment on Count One for the 2016 solicitation packets, *supra* Section II.C.2.a, does not affect the Court's conclusion on damages.  Consumers were misled in a variety of ways.  Thus to the extent that Mr. Aria provides no argument on damages, the Court agrees with CFPB that the amount paid to Defendants less any refunds is the appropriate restitution amount.

32

1    **III.    DEFAULT JUDGMENT**

2        **A.    Legal Standard**

3        "When a party against whom a judgment for affirmative relief is sought has failed

4    to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk

5    must enter the party's default."  Fed. R. Civ. P. 55(a).  After default is properly entered, a

6    party seeking relief other than for a sum certain must apply to the Court for a default

7    judgment.  *Id.* 55(b).

8        Default judgments are ordinarily disfavored.  *Eitel v. McCool*, 82 F.2d 1470, 1472

9    (9th Cir. 1986).  Accordingly, the Court looks to seven factors to determine whether

10   default judgment is appropriate: (1) possibility of prejudice to the plaintiff; (2) merits of

11   the plaintiff's substantive claim; (3) sufficiency of the complaint; (4) sum of money at

12   stake in the action; (5) possibility of a dispute concerning material facts; (6) whether the

13   default was due to excusable neglect; and (7) the strong policy favoring decisions on the

14   merits.  *Id.* at 1471–72.

15       Upon default, the factual allegations in the complaint are taken as true, except

16   those related to the amount of damages.  *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560

17   (9th Cir. 1977).  The decision to grant or deny default judgment is within the discretion of

18   the Court.  *Eitel*, 82 F.2d at 1471.

19       **B.    Application**

20       Applying the *Eitel* factors to the case, the Court concludes that default judgment is

21   appropriate, and CFPB's Motion for Default Judgment against Global is **GRANTED**.

22   The only factor that weighs against a default judgment is the seventh factor, the strong

23   policy favoring decisions on the merits.  But this factor alone is not dispositive, especially

24   when every other factor leans the other direction.

25       On the first factor, there is possibility of prejudice to CFPB if default judgment is

26   not entered.  CFPB will be prejudiced absent a default judgment because "[w]ithout

27

28

allowing default judgment, Plaintiff will have no other recourse available." *SEC v. Blockvest, LLC*, No. 18CV2287-GPB(MSB), 2020 WL 5064330, at *2 (S.D. Cal. Aug. 26, 2020). Without a final order or judgment, consumers affected by Global's conduct would have no available recourse. *Cf. CFPB v. Siringoringo*, No. SACV 14-01155 JVS(AWx), 2016 WL 102435, at *2 (C.D. Cal. Jan. 7, 2016) (favoring default judgment on the first *Eitel* factor because the victims of defendant's violation of the CFPA may be compensated based on a judgment imposing a civil monetary penalty).

On the second and third factors, the merits of CFPB's claims and the sufficiency of its Complaint weigh in favor of default judgment as well. To meet these factors, the allegations in the Complaint must be sufficient to state a claim upon which a plaintiff can recover. *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978). A complaint satisfies this standard when the claims "cross the line from the conceivable to plausible." *Ashcroft v Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

Indeed, CFPB's claims are plausible based on the allegations in the Complaint. Global is a "covered person" under the CFPA because it offered, marketed, and sold student financial aid advisory services. 12 U.S.C. § 5481(15)(a)(viii). The CFPA prohibits "covered persons" from engaging in deceptive practices. *Id.* §§ 5531, 5536(a). "An act or practice is deceptive if: "(1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *CFPB v. Gordon*, 819 F.3d 1179, 1192–93 (9th Cir. 2016) (quotations omitted).

Taking all allegations in the Complaint as true, Global engaged in deceptive practices because it represented to consumers that it would apply for student financial aid programs on consumers' behalf and conduct extensive searches to match consumers with student financial aid opportunities, when in fact, it did not. Additionally, Global

represented that unless consumers send their applications and pay a fee by a specified deadline, consumers would lose their opportunity to receive financial aid, when such was not the case.  Global also presented itself through its use of logos as being affiliated with the federal government or a college or university, when it was not.  Therefore, Global would be liable under the CFPA on Counts One to Four.

Global also violated "Regulation P," 12 C.F.R. § 1016.4(a), which in turn violates 12 U.S.C. § 5536(a)(1) of the CFPA.  Global did not provide consumers with a clear and conspicuous privacy notice when it accepted a fee for its student financial aid advisory services.  This was required under Regulation P, a consumer financial law.  Global would thus be liable under the CFPA on Count Five as well.

Furthermore, in support of these allegations, CFPB provided copious amounts of evidence, such as witness declarations, exhibit documents, and testimonies by CFPB enforcement investigators.  Collectively, the second and third *Eitel* factors weigh in favor of default judgment.

Moving on to the fourth factor, the sum of money at stake in the action is reasonable considering the seriousness of Global's conduct.  "Default Judgment is disfavored where the same [sic] of money at stake is too large or unreasonable in light of defendant's actions." *J & J Sports Prods., Inc. v. Betancourt*, No. 08CV937JLS (POR), 2009 WL 3416431, at *3 (S.D. Cal. Oct. 20, 2009) (quotations omitted).  Such is not the case here.  According to the Complaint, there were "a total of 76,000 violations" and the maximum civil money penalty of such magnitude would be well over $100 million.  But CFPB is only seeking restitution of the violations in addition to civil money penalties of $10 million.  *Cf. CFPB v. Siringoringo*, No. SACV1401155JVSAJWX, 2016 WL 102435, at *3 (C.D. Cal. Jan. 7, 2016) (finding the fourth factor in favor of default judgment because the civil penalty sought was significantly lower than what defendants could potentially be liable for).

On the fifth factor, there is no likelihood of dispute concerning material facts because upon entry of default, all well-pleaded facts must be taken as true except for damages. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).

On the sixth factor, the default was not due to any excusable neglect. This factor weighs in favor of default judgment when defendants were properly served, because proper service means that "failure to appear and litigate the matter is not likely based on excusable neglect." *Dang v. Pontier*, No. 19CV1519-GPC(AHG), 2020 WL 5521133, at *4 (S.D. Cal. July 22, 2020). Here, both Defendants were properly served. In fact, Global was represented until it fired its counsel and failed to comply with the Court's order to secure substitute counsel. *Cf. Arco Envtl. Remediation, L.L.C. v. RDM Multi-Enterprises, Inc.*, 166 F. App'x 929, 930 (9th Cir. 2006) (finding that the district court did not abuse its discretion by entering a default judgment when defendant failed to retain a lawyer after being ordered to do so). Meanwhile, Mr. Aria, the founder, owner, CEO, and registered agent of Global and the person who has overseen all aspects of Global's operations, UF Nos. 3, 6, ECF No. 112-1, has continued with the lawsuit.

Finally, on the seventh factor, there is indeed strong policy to decide on the merits and avoid default judgments. Cases should be decided on the merits when possible. *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985). However, this factor alone is not dispositive. It is outweighed by all the other *Eitel* factors that have so far favored default judgment. *See, e.g.*, *Philip Morris USA, Inc. v. Castworld Prod., Inc.*, 219 F.R.D. 494, 501 (C.D. Cal. 2003); *PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).

## C. Remedies

Upon granting CFPB's Motion for Default Judgment against Global, the Court must now determine what remedy is appropriate. Based on the Complaint, CFPB seeks: (1) an injunction from committing future violations of the CFPA; (2) an injunction from

harming consumers through advertisement, marketing, promotion, sale, or offering for sale any consumer financial product or service; (3) restitution; (4) civil money penalties; and (5) costs of bringing this action, as well as any other additional relief that the Court deems just and proper.  Compl. 14–15, ECF No. 1.  CFPB's Motion for Default Judgment narrows the request for relief to: (1) injunctive relief; (2) restitution; and (3) $10 million in civil money penalties.  Pl.'s Mem. for Mot. for Default J. 10, ECF No. 107-1.

The Court concludes that all three requested remedies in CFPB's Motion are reasonable and appropriate.  An injunction is appropriate to prevent Global from committing future violations.  A restitution in the amount of $4,738,028 is appropriate since this is the undisputed sum paid by 76,000 consumers who purchased Global's "program" based on its misrepresentations, minus the refunds that Global issued.  *See* Pl.'s Mem. for Partial Summ. J. 24, ECF No. 106-1.  And a civil money penalty amounting to $10 million is reasonable and appropriate, especially considering that the maximum applicable penalty would exceed $100 million.

## IV.   CONCLUSION

For reasons discussed above, **IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment against Defendant Armond Aria, ECF No. 106, is **GRANTED IN PART and DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment for a permanent injunction is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Default Judgment against Defendant Global Financial Support, Inc., ECF No. 107, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Armond Aria and Global Financial Support, Inc. shall pay restitution in the amount of $4,738,028 and a civil money penalty in the amount of $10 million, and are held jointly and severally liable for these sums.

15-cv-2440-GPC-AHG

1   **IT IS FURTHER ORDERED** that Plaintiff shall submit a proposed order to the

2   Court by <u>February 5, 2021</u> so that the Court may issue an injunction of an appropriate

3   scope against the Defendants pursuant to this Order.

4   **IT IS SO ORDERED.**

5

6   Dated:  January 25, 2021

7                                             Hon. Gonzalo P. Curiel

8                                             United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15-cv-2440-GPC-AHG